JACK R. MILLER, Circuit Judge.
 

 These appeals are from a decision of the United States Claims Court under the Contract Disputes Act of 1978, Pub.L. No. 95-563, 92 Stat. 2383-91, 41 U.S.C. §§ 601-613 (1982) (“CDA”), and involve a contract for building construction at Plum Island, New York. They present two issues: (1) Whether the Claims Court committed reversible error in granting summary judgment dismissing the petition of appellant on the ground that, as a matter of law, fraud committed in one aspect of the contract prior to termination for default constitutes an independent basis for upholding the termination where the fraud was not expressly stated as a ground for termination by the Contracting Officer (“CO”); (2) whether the CDA mandates that Government claims related to a pre-CDA contract must first be the subject of a decision by a CO if, as in this case, the contractor elects to proceed under the CDA.
 

 On the first issue (Appeal No. 84-826), we affirm the Claims Court’s decision granting summary judgment dismissing Morton’s petition. On the second issue (Appeal No. 84-854), we affirm the Claims Court’s decision denying the Government’s motion for leave to file counterclaims because they have not been the subject of a decision by the CO.
 

 Background
 

 On September 24, 1976, Joseph Morton Company (“Morton”) entered into a fixed price contract (No. 12-14-0605-192) with
 
 *1275
 
 the Science and Education Administration of the Department of Agriculture for the construction of animal disease research facilities, including extensions to biohazard containment laboratories. The original amount of the competitively bid contract was $10,049,000, but it was changed by amendment to $10,779,997.
 

 Throughout the term of the contract, the Government issued numerous change orders, field orders, and revisions to the drawings. Prior to initiation of the construction, the Government issued the first substantiva change order following the award of tfie contract, change order No. 2. This was a revision of the air handling and filtration system. On April 27, 1981, Morton was convicted in the United States District Court for the Eastern District of New York for the crimes of conspiring to defraud the Government (in respect to change order No. 2) under 18 U.S.C. §§ 2 and 371 and, in furtherance of the conspiracy, knowingly submitting false and fraudulent cost statements to the Government under 18 U.S.C. §§ 2, 1001, and 3237.
 
 United States v. Joseph Morton Co.,
 
 Docket No. CR-80-00413 (E.D.N.Y. Apr. 24, 1981),
 
 aff'd,
 
 Nos. 81-1174/1233 (2d Cir. Jan. 11, 1982). In the same action, the district court also convicted Morton of obstructing justice by removing, concealing, and destroying documents requested by the grand jury pursuant to two
 
 subpoenas duces tecum
 
 related to the same change order under 18 U.S.C. §§ 2, 1503, and 3237. Morton was heavily fined, and two of its principal employees were sentenced to terms of imprisonment, which terms have been served.
 

 The Government issued at least four cure notices in response to deficiencies by Morton during the course of the contract. The last cure notice was issued in February, 1979, and was fifty-five pages in length. It directed Morton to remedy the problems enumerated therein or demonstrate substantial progress toward compliance within ten days after receipt. Morton’s response was considered unsatisfactory and, on March 28, 1979, the contract was terminated for default due to the alleged deficiencies.
 

 Thereafter, on March 3, 1980, Morton filed for a Chapter 11 voluntary bankruptcy, which, if granted, would have permitted it to avoid liability for damages, including reprocurement costs. On March 1, 1982, the Government filed suit in the United States District Court for the Eastern District of New York against Seaboard Surety Company (“Seaboard”), Morton’s surety on the contract performance bond, seeking to recover under the bond for Morton’s breaches of the contract.
 
 United States v. Seaboard Surety Co.,
 
 Civil Action No. CV-82-0518. The bankruptcy proceeding was dismissed on April 8, 1983, thus dissolving the automatic stay and rendering Morton liable for its debts.
 
 See
 
 11 U.S.C. § 362 (1982).
 

 Also on March 1, 1982, Morton filed an action in the Court of Claims (now the Claims Court, to which the case was subsequently transferred), seeking to convert the default termination into a termination for the convenience of the Government.
 
 Joseph Morton Co. v. United States,
 
 No. 107-82C (Dec. 16, 1983). The thrust of its allegations was that it had been wrongfully terminated because the Government was, at least in part, responsible for Morton’s alleged breaches, and that Morton adequately responded to the Government’s last cure notice, issued in February, 1979.
 

 On August 23, 1982, the Government moved for summary judgment sustaining the default termination — not on the basis of the asserted performance deficiencies which led to the CO’s decision of March, 1979, but on Morton’s convictions for false and fraudulent cost submissions. Although the Government denied that the contract was wrongfully terminated for alleged performance deficiencies, for purposes of the summary judgment motion and of this appeal, it has argued only fraud in support of the default termination on the contract and has not asserted performance deficiencies.
 
 [1]
 
 Morton opposed the summa
 
 *1276
 
 ry disposition, arguing that a conviction for the submission of false documentation with respect to a single change order during the performance of a very large and complex contract does not permeate the entire contract and, therefore, does not support a default termination.
 

 At the time the suit was filed, the Government could not counterclaim for damages, because of the temporary automatic stay imposed under the bankruptcy proceedings and the pending suit against Morton’s surety. However, on May 24, 1983, after the bankruptcy proceedings were terminated and the stay lifted, the Government moved the court for permission to amend its answer to assert two counterclaims: one for common law breach of contract, and the other for excess reprocurement costs. On July 12, 1983, the Claims Court sustained the default termination.
 
 Joseph Morton Co. v. United States,
 
 3 Cl.Ct. 120 (1983). Entry of the judgment was deferred, however, to allow Morton to respond to the Government’s motion to amend.
 

 At some point between April 8, 1983, when Morton’s bankruptcy proceedings were terminated, and November 18, 1983, the date of the Claims Court’s opinion on the Government’s motion to add the counterclaims, Seaboard impleaded Morton as a third-party defendant in the pending Eastern District of New York suit.
 
 [2]
 

 Joseph Morton Co. v. United States,
 
 3 Cl.Ct. 780, 782 (1983). In the Claims Court, Morton opposed the filing of the Government’s proposed counterclaims on the grounds that (1) the July 12, 1983, Claims Court opinion effectively dismissed the complaint in that forum so that no counterclaim could be filed, and (2) a contracting officer’s decision is a prerequisite to the assertion of the Government’s claims and, thus, the Government’s claims were premature.
 

 In its November 18 opinion, the Claims Court stated that the prerequisite for its jurisdiction over counterclaims is the filing of a claim within the jurisdiction of the court under 28 U.S.C. §§ 1503, 2508 (1982). It found that, in this case, although Morton’s claim lacked merit, the original claim set forth a contract claim against the United States and, thus, fulfilled the requirement; further, that even though the counterclaims were not asserted within the normal response period during the pleading stage of the litigation, the exercise of the court’s discretion to permit amendment at this time would fit squarely within the bounds of statutory and decisional law. “[T]he procedure generally employed is to defer entry of a final judgment on a plaintiff’s claim within the court’s jurisdiction pending final resolution of any counterclaim(s) correctly asserted in the matter involved.”
 
 Joseph Morton Co.,
 
 at 783,
 
 citing Astro-Space Laboratories, Inc. v. United States,
 
 470 F.2d 1003 (Ct.Cl.1972).
 

 In response to Morton’s second ground for opposing the Government’s counterclaims, the court cited the CDA and decisional law in concluding that the United States cannot assert its claims first in the Claims Court if Morton elects to bring those claims under the CDA.
 
 Joseph Morton Co.,
 
 at 783-784. It found that the contract to which Morton was a party is covered by section 16 of the CDA, Public Law 95-563. The Claims Court said that this provision governs the contract in suit and adopted the interpretation of its predecessor, the Court of Claims, namely: that the provision permits the contractor to elect whether a Government claim, initiated after enactment of the CDA, must be brought only under the provisions of the CDA.
 
 Joseph Morton Co.,
 
 at 783. Under the CDA, the Government is bound by 41 U.S.C. § 605(a), which requires all Government claims to be “the subject of a decision by the contracting officer.” 41 U.S.C. § 605(a). The Claims Court ordered Morton to file a statement electing whether or not to proceed under the CDA with respect
 
 *1277
 
 to the Government’s counterclaims. Morton elected to proceed under the CD A, and, by an order and judgment dated December 16, 1983, its complaint was dismissed, thereby effectively denying the Government’s motion for leave to file an amended answer and counterclaims.
 

 Discussion
 

 (a)
 
 Appeal 84-826, Newly Discovered Grounds for Prior Termination
 

 On this point, Morton argues that its claim should not have been dismissed, because the commission of a crime does not always constitute a material breach of contract, and the court should have taken into consideration factors such as the nature and extent of the fraud committed; also, that only one of the many change orders was tainted; further, that reliance by the Government on prior false statements is an
 
 “ex post facto”
 
 justification for a default termination and is improper where the Government is seeking money damages; in addition, the relationship of the fraud to the contractor’s performance should have been assessed, because even if Morton’s prior acts can be asserted after a termination for convenience, its overall performance should have been examined to determine whether its actions warranted default termination.
 

 Next, Morton argues that the ruling of the Claims Court deprived it of fundamental fairness, because it exposed Morton and its surety to a potential liability of about $14 million — a much greater amount than it had been penalized for violating the provisions of Title 18. However, in
 
 United States v. Acme Process Equipment Co.,
 
 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966), the Court stated:
 

 [W]here there is commercial bribery in the form of a kickback, there is something specific which the Government can recover, and hence it was quite natural for Congress to provide this express remedy. There is absolutely no indication in the legislative history of the Anti-Kickback Act that Congress, in providing a civil remedy for a more tangible evil, intended to preclude other civil sanctions necessary to effectuate the purpose of the Act.
 

 385 U.S. at 145, 87 S.Ct. at 355.
 
 [3]
 
 The Court thus ruled that a criminal statute which explicitly provides a civil penalty may support another sanction to effectuate the policy underlying the statute. We are not persuaded by Morton’s assertion that imposition of a potentially large penalty would infringe its due process rights.
 

 With respect to Morton’s first argument, “[I]t is settled law that a party can justify a termination if there existed at the time an adequate cause, even if then unknown.”
 
 Pots Unlimited, Ltd. v. United States,
 
 600 F.2d 790, 793 (Ct.Cl.1979) (citations omitted). Therefore, if the fraud committed by Morton during performance would support the Government’s termination for default if discovered before termination of the contract, evidence of such fraud discovered thereafter would also support a default termination.
 

 Morton does not dispute this, but asserts that its fraud did not rise to the level necessary to “taint” the entire performance.
 
 [4]
 
 It points out that there were approximately 950 alterations and change orders by the Government and asserts that a court should balance the one act of its admitted fraud against its overall performance and good behavior on the other aspects of the contract. This, it says, would show that the fraud was
 
 de minimis
 
 and did not taint the entire contract. Morton adds that the court should consider that the Government’s alterations to the contract were so numerous and “hopelessly defective” that it was error for the Claims Court to find that the fraud it committed on the
 
 *1278
 
 United States mandates a termination for default.
 
 [5]
 

 The Government replies that only 32 change orders were executed, but concedes that, in addition, approximately 525 proposed alterations and drawing amendments were made. The precise number is impossible to assess from the record before us and neither party’s assertion is substantiated. The Government asserts that, although Morton was convicted on only one fraud count, the aspect of the contract to which the change order related was fundamental to the contract; thus, the impact of the fraud in this procurement was substantial.
 

 In our view, the number of alterations, whether 950 or 525, is irrelevant. On any complex Government contract, a large number of alterations is likely. For instance, during the congressional hearings on the CDA, Admiral H.G. Rickover testified that it is not unusual for there to be as many as 3,350 changes in a complex contract for the Navy.
 
 See Hearings on S. 2292, S. 2787, S. 3178 Before the Subcomms. on Federal Spending Practices and Open Government, Governmental Affairs, Citizens and Shareholders Rights and Remedies and The Judiciary,
 
 95th Cong., 2d Sess. 39-40 (1978). In the instant case, the contract was for the construction of animal disease research facilities, and the 525 to 950 alterations or proposals made by the Government, while not small, is not of the mind-boggling magnitude that Morton suggests. A contractor such as Morton assuming the responsibilities of performing a large, sophisticated contract for the Government should expect changes.
 

 Morton’s point that the court should perform a balancing test between its one fraudulent act and the amount of work performed “free” of fraud is contrary to precedent. The Claims Court relied on several recent cases in declaring that “[a] contractor which engages in fraud in its dealings with the government on a contract has committed a material breach justifying a termination of the entire contract for default.”
 
 Joseph Morton Co.,
 
 3 Cl.Ct. at 122,
 
 citing College Point Boat Corp. v. United States,
 
 267 U.S. 12, 15-16, 45 S.Ct. 199, 200-201, 69 L.Ed. 490 (1925);
 
 Pots Unlimited, Ltd. v. United States, supra.
 
 In
 
 United States v. Acme Process Equipment Co., supra,
 
 the court held that the Anti-Kickback Act, which clearly expresses a policy opposed to kickbacks, authorizes the cancellation of a Government contract. Justice Black, writing for the Court, stated the
 
 ratio decidendi
 
 as follows:
 

 [Ejven if the Government could isolate and recover the inflation attributable to the kickback, it would still be saddled with a subcontractor who, having obtained the job other than on merit, is perhaps entirely unreliable in other ways. This unreliability in turn undermines the security of the prime contractor’s performance — a result which the public cannot tolerate, especially where, as here, important defense contracts are involved.
 

 385 U.S. at 144-45, 87 S.Ct. at 355. This statement underscores the necessity for the Government to be secure in its confidence in its contractors.
 

 In
 
 K & R Engineering Co. v. United States,
 
 616 F.2d 469 (Ct.Cl.1980), a contractor brought suit to recover damages for an alleged breach of contract terminated for convenience by the Government. The court held that the Government was entitled to recover the amount paid under contracts that had been procured through the contractor’s violation of the conflict of interest statute, 18 U.S.C. § 208(a).
 

 The policy underlying the statutory precursor to the present conflict of interest statute was further explained in
 
 United States v. Mississippi Valley Generating Co.,
 
 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), in which the Court stated that—
 

 protection [of the public] can be fully accorded only if contracts which are tainted by a conflict of interest on the part of a government agent may be dis-
 
 *1279
 
 affirmed by the Government____ Were we to decree the enforcement of such a contract, we would be affirmatively sanctioning the type of infected bargain which the statute outlaws and we would be depriving the public of the protection which Congress has conferred.
 

 364 U.S. at 563, 81 S.Ct. at 316.
 

 Thus, there is support for the argument that any fraud warrants termination for default as a matter of law.
 
 See also Brown v. United States,
 
 524 F.2d 693 (Ct.Cl.1975). However, we merely hold that, in this case, the fraud committed by Morton was sufficient to warrant termination of the contract by default.
 

 (b)
 
 Appeal 84-854
 

 In appeal 84-854, the Government’s position is that the Claims Court erred in holding that its counterclaims must be resolved by a CO due to Morton’s election to proceed under the CDA. It contends that the Claims Court misinterpreted section 16 of the CDA; that this pre-CDA contract contained the standard default clause which reserved to the Government common law remedies that could only have been brought in a federal district court; and that, in any event, since the CDA provides that no agency heads may adjust any claim involving fraud, a CO is not empowered to resolve the claims of the Government.
 

 (1) Interpretation of “any claim” Language of CDA
 

 This issue turns on whether the Government is subject to the CDA. If so, 41 U.S.C. § 605(a) applies, which provides in pertinent part: “All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer....”
 
 See Paragon Energy Corp. v. United States,
 
 645 F.2d 966 (Ct.Cl.1981). Thus, if the CDA applies, the Government’s counterclaims against Morton must be subject to a decision by a CO before the Government can assert them in the Claims Court.
 

 Section 16 of the CDA (originally proposed in the bill as section 15) was enacted to serve the purpose of a grandfather clause. It prescribes when application of the Act becomes mandatory and it also attempts to dictate the course of actions dependent on contracts entered into before the bill was signed, thus:
 

 “This Act ... shall apply to contracts entered into one hundred twenty days after the date of enactment____ Notwithstanding any provision in a contract made before the effective date of this Act,
 
 the contractor may elect to proceed under this Act with respect to any claim pending then before the contracting officer or initiated thereafter."
 

 41 U.S.C. § 601, Note entitled “Effective Date” (emphasis supplied). Although the Government disputes the applicability of the clause (and thus the CDA) because the contract in question was entered into in 1976 (before the effective date of the CDA), the universally accepted meaning of the provision is that “[t]he act shall apply to all contracts made after the effective date of the act. However, the contractor may elect to proceed under the provisions of the act even if the contract was made prior to the effective date of the act.” H.R.Rep. No. 1556, 95th Cong., 2d Sess. 11 and 33 (1978). In this case, of course, Morton has so elected.
 

 The dispute here is over the phrase underscored in the above quotation. Morton argues that the words “any claim” refer to
 
 any
 
 claim, by the contractor or by the Government; whereas, the Government asserts that they refer to only claims by the contractor. They have been interpreted by only two appellate courts: the Court of Claims in
 
 Tester Corp. v. United States,
 
 227 Ct.Cl. 648 (1981), and the First Circuit in
 
 Woods Hole Oceanographic Institution v. United States,
 
 677 F.2d 149 (1st Cir.1982). There is a total conflict between these interpretations.
 

 The Claims Court has followed
 
 Tester Corp.,
 
 where the court held that the contractor, at its discretion, could bring within the provisions of the CDA a pre-CDA contract claim by the Government pending before the CO on the effective date of the CDA. Unfortunately, neither the First Cir
 
 *1280
 
 cuit, in its
 
 Wood’s Hole
 
 opinion, nor the Court of Claims in
 
 Tester Corp.
 
 based its interpretation on the legislative history of the CDA.
 

 The first step in determining the meaning of statutory language is to ascertain its plain meaning. In this case, the words “any claim” could be no plainer. If Congress had intended them to exclude claims of the
 
 Government,
 
 it would hardly have used the word “any.” Moreover, a review of the legislative history of the CDA relating to section 16 is persuasive that there existed no such intent.
 

 The purpose of Congress in promulgating the CDA was “[t]o provide for the resolution of claims and disputes relating to Government contracts....” Pub.L. No. 95-563, 92 Stat. 2382 (Nov. 1, 1978). The CDA provides that each claim must first be subject to a determination by a CO, a person with expertise in the administration of Government contracts — often in the field of the contract at issue. Also, the CO has had experience in dealing with the parties in suit and is likely to understand the problems involved and the claims asserted by each party. It is, therefore, appropriate for the CO to render a decision on claims before they are asserted elsewhere.
 

 We take note that the Claims Court possesses broad discretion in exercising its power to consolidate. Section 10(d) of the CDA, 41 U.S.C. § 609(d),
 
 Consolidation,
 
 provides for consolidation of cases by the Claims Court. The legislative history emphasizes the importance of consolidation of suits:
 

 It is the intent of the committees that splitting of the causes of action, or suits, under one contract be kept to a minimum.... [I]t is intended that the Court of Claims have the same ultimate authority to consolidate suits that are split between the court and the agency boards....
 

 ... It is the intent of the section to make available the opportunity to consolidate like suits in one jurisdiction, but this action should weigh the positions of the parties involved.
 

 S.Rep. No. 1118, 95th Cong. 31,
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad.News 5235, 5265. Thus, where the Claims Court has a contractor claim before it and the contractor elects to proceed under the CDA, the court possesses the power to stay such a claim pending the CO’s determination of a Government counterclaim, and to then consolidate the claims for trial.
 

 The Government argues that the holding (Government’s counterclaim not subject to CDA and may be brought without CO decision) and reasoning of the First Circuit should prevail, but merely quotes conclusory statements from
 
 Wood’s Hole
 
 and ignores the holding in
 
 South Corp. v. United States,
 
 690 F.2d 1368, 215 USPQ 657 (Fed.Cir.1982) that makes the Court of Claims decision in
 
 Tester Corp.
 
 binding precedent on this court.
 

 The Government’s argument that certain provisions of the pre-CDA contract before us preclude application of the CDA is expressly refuted by language in the provision at issue:
 
 “Notwithstanding any provision in a contract made before the effective date of this Act,
 
 the contractor may elect to proceed under this Act....” (Emphasis supplied.)
 

 (2) No Preclusion of Decision by CO by Fraudulent Activity in Performance of Contract
 

 The Government asserts that the CDA does not apply to any of the Government’s claims, but that, if it does, the last sentence of 41 U.S.C. § 605(a) applies to remove its claims from the jurisdiction of the CO. The last sentence of section 605(a) provides: “This section shall not authorize any agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud.” Because fraud is the basis for its counterclaims, argues the Government, the authority to decide Government claims explicitly granted in the second sentence of the same section is nullified.
 

 This argument fails for two reasons. First, the Government does not even suggest that the term “contracting officer,” who, under the second sentence of section
 
 *1281
 
 605(a), shall decide “[a]ll claims by the government,” and the term “agency head” in the sentence quoted above, are equivalents. Unless this can be shown, the fact that an agency head does not have a particular grant of authority neither adds to nor subtracts from the authority granted a contracting officer. We are persuaded that the use by Congress of two different terms in the same paragraph of the statute manifests an intent that they not be considered equivalents.
 

 Second, even if the Government were to show that Congress intended “agency head” to refer to “contracting officer,” there is a clear indication in the legislative history that Congress did not intend the word “claim” to mean the whole case between the contractor and the Government; but, rather, that “claim” mean each claim under the CDA for money that is one part of a divisible case. S.Rep. No. 1118 (on S. 3178, a precursor of the bill that became Pub.L. No. 95-563), 95th Cong., 2d Sess. 20,
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad.News at 5254. Morton’s fraud has already been determined. Thus, liability for reprocurement costs and damages will not be an issue before a CO. Those claims, which are clearly not inextricably linked with liability for fraud, must first be the “subject of a decision by the contracting officer.” 41 U.S.C. § 605(a). For the foregoing reasons, we hold that the Government’s counterclaims must first be raised before a CO.
 

 (c) Government’s Allegation of Compulsory Counterclaims
 

 Because the Government’s counterclaims do not fit within the definition of a Rule 13(a) compulsory counterclaim, the issue of whether the Claims Court properly refused to permit a compulsory counterclaim need not be reached.
 

 In view of the foregoing, the decisions of the Claims Court are
 
 affirmed.
 

 Each party shall bear its own costs.
 

 AFFIRMED.
 

 [1]
 

 . The Government also asserted as an affirmative defense 28 U.S.C. § 2514 (1982), Forfeiture
 
 *1276
 
 of fraudulent claims, which the Claims Court did not address due to its disposition of the case.
 

 [2]
 

 . The exact date of the termination is not in the record before us, but it is unimportant for purposes of this opinion.
 

 [3]
 

 . Although the Court was referring to a criminal violation of the Anti-Kickback Act, its language is equally applicable to Morton’s fraud in this case.
 

 [4]
 

 . The effect of dismissal of Morton’s claim would be that it fails to attain its objective that the court change termination from default to convenience.
 

 [5]
 

 . In essence, Morton proposes something akin to comparative fault.