**Charles W. DAFF, Trustee in Bankruptcy for Triad Microsystems, Inc., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 90–3952C, 90–3958C.**

United States Court of Federal Claims.

Aug. 15, 1994.

Richard W. Schwartzman, Washington, DC, and V. Keith Young, Orlando, FL, for plaintiff; Gerson B. Kramer, of counsel.

John Warshawsky, with whom were Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, and Bryant G. Snee, Washington, DC, for defendant, Ralph E. Avery, Dept. of the Army, and Hal C. Dilworth, Jr., U.S. Army Missile Command, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action brought pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1988) ("CDA"). On May 9, 1988, the Contracting Officer ("CO") terminated the contract at issue for default because of alleged fraud on the part of Triad Microsystems, Inc., the contractor. On January 3, 1990, the CO entered a second final decision, this time demanding return of unliquidated progress

payments. In its appeal, Triad[1] seeks to have those decisions set aside. Defendant has counterclaimed to recover on its claim for unliquidated progress payments as a remedy for fraudulent breach of contract, for forfeiture of plaintiff's "claims," and for damages and penalties under the False Claims Act. After trial, and for the reasons set forth below, the court concludes that the defendant has established by clear and convincing evidence that there was fraud in the performance of the contract. The default termination is, accordingly, sustained and defendant and is entitled to return of unliquidated progress payments. It is also entitled to recover damages and penalties under the False Claims Act.

## BACKGROUND FACTS

The contract at issue was awarded in September 1984 by the United States Army Missile Command ("MICOM"), acting through the Small Business Administration. By the terms of the contract, Triad was required to produce 1,432 TOW Missile Vehicle Power Conditioners ("TVPC"). The total price of the contract was approximately $21,000,000.

The TOW missile is a versatile guided missile used in many battlefield applications as an anti-armor weapon. During its trajectory to a target, it maintains a connection to a guidance source by means of a tiny wire, which can pay out up to two miles. The operator focuses on the target, thereby automatically sending directional information to the missile in flight. The TVPC is a device used as an interface between the TOW missile and a vehicle, such as a jeep. The vehicle's battery is a source of electricity to power the guidance apparatus. The battery current is converted to alternating current, amplified, and then reconverted to direct current.

Colonel Thomas Devaney, who manages acquisition for the Army on a number of systems, including the TOW, testified concerning the TVPC. He explained the importance of the conditioners to reliable operation of the missiles in battlefield settings. The missiles are deployed in a number of harsh environments. Consequently the TVPC can be exposed to salt fog on long ocean voyages and to rain, humidity, and dust. The unit, accordingly, must be reasonably weatherproof. Its most recent notable application was in Operation Desert Storm. Colonel Devaney explained that the contract at issue was not merely for production of training devices. The TVPC's procured went into the Army's combat inventory.

Triad points out that the contract was a DOD 1000B, Level 3, contract. The effect of this is that the contractor did not need special interpretive expertise in implementing the data package. It should have been able to follow the drawings and achieve a satisfactory product. In fact, there were 67 "deviation and waivers" granted during contract performance, prompted by inaccuracies and gaps in the Technical Data Package ("TDP"). Triad offered to rewrite and update the TDP, but MICOM declined, indicating that the work would be performed by another contractor, although it never was.

The contract contains a provision at section E making the work subject to the "Higher-Level Contract Quality Requirement" set out at MIL-Q-9858A. This specification creates a generally higher level of quality controls than would otherwise be applicable. Among other elements, at paragraph 3.4 "Records," it directs the contractor to ensure that

> records are complete and reliable. Inspection and testing records shall, as a minimum, indicate the nature of the observations together with the number of observations made and the number and type of deficiencies found. Also, records for monitoring work performance and for inspection and testing shall indicate the acceptability of work or products and the action taken in connection with the deficiencies. The quality program shall provide for the analysis and use of records as a basis for management action.

The contract incorporated by reference Federal Acquisition Regulation ("FAR") § 52.246–2 which, in substance, requires the

---

1. Because Triad is in bankruptcy, the action is prosecuted in the name of the Trustee. Plaintiff will be referred to as Triad throughout the opinion.

contractor to establish an inspection system that results in delivery of an end item that has "been inspected and ... found by the Contractor to be in conformity with contract requirements." The regulation also requires the contractor to "prepare records evidencing all inspections made under the system and the outcome." *Id.* § 52.246–2(b).

John Pacetti is President of Triad. Corporate headquarters were in Santa Ana, California. At the time of the contract at issue, Triad had a number of government contracts pending. The production work on the TVPC contract was to take place at Triad's facility in Huntsville, Alabama. At the time of the TVPC contract, Triad was also working on other government contracts at the Huntsville facility.

Charles Huggins came to Triad in July 1987 as a consultant, hired by Pacetti to advise him with regard to the personnel, facility, and processes at the Huntsville plant. Huggins was not entirely pleased with what he found, particularly with regard to personnel. Joseph Griggs, who was appointed production manager somewhat later, also testified to problems with workmanship, even at a subassembly level, and a high number of rejects. In September, Huggins was made plant manager. He was tasked with getting the facility reorganized and the TVPC contract back on schedule. It is clear enough from the testimony of Huggins and Pacetti that the headquarters office believed that production needed to be speeded up dramatically in Huntsville. During this period Huggins reported to John Danes, Chief Operating Officer, at the Santa Ana office.

On May 9, 1988, the CO terminated the contract for default prior to expiration of the contract term. No cure notice preceded the termination. Default was premised on the alleged falsification of records that the contract required be maintained with respect to certification of solderers. No other ground was offered. Subsequent to default, the CO demanded the return of excess progress payments in the amount of $6,251,924.78.

At the time of default, Triad had received $11,166,479.00 in progress payments. MICOM had been furnished 673 TVPC units that Triad represented as meeting contract requirements. The government put on some evidence at trial that the delivered goods had a contract value of $4,914,554.22. Triad admits to a value of $5,564,301.64. Plaintiff's Response to Def.Prop. Finding of Fact 134.

The delivered units were gathered after default at the Anniston Army Depot in Anniston, Alabama. There the units were opened up, tested, repaired if necessary, and slightly modified by the addition of a foam rubber insulating pad. The government incurred expenses in the amount of $240,714.74 in doing this testing and repair. After this work, at least 615 units were deployed. There was no evidence at trial of failures of the unit in the field.

A large amount of parts and work in process was left in place at the Huntsville facility. After negotiation between the parties concerning the disposition of this material, MICOM took possession and put it into storage. Triad asserts that these materials are worth $6,148,081.74. Over the defendant's objection the court permitted evidence at trial regarding whether the agency had accepted the parts and work in process, but segregated the valuation question pending the outcome of the trial on the default issue.

## DISCUSSION

*Jurisdiction*

In a motion in limine filed shortly before trial, plaintiff sought to preclude "further proof by defendant under the Contract Disputes Act." The predicate for that motion was that, because defendant had dropped the basis for default stated in the termination letter, no other ground could now be interposed, as the CO's decision is the jurisdictional prerequisite to suit. The court rejected that motion without opinion. The denial was supported by *Joseph Morton Co. v. United States,* 757 F.2d 1273 (Fed.Cir.1985), which held that subsequently discovered fraud can be used to justify a default termination. Implicit in this court's denial of the motion in limine is the conclusion that the *Morton* holding is not limited to cases involving pre-CDA contracts, as plaintiff suggests. The relief that plaintiff sought in the motion in limine was a limitation on the govern-

ment's proof of its CDA claims, i.e., termination and return of unliquidated progress payments.

The full implication of plaintiff's argument has now become manifest in plaintiff's post-trial briefing and in post-trial oral argument. Plaintiff in effect is urging the dismissal of its complaint. As it explains:

> This case came to the court on the basis of a government CDA claim premised upon the contracting officer's default termination.... This Court's jurisdiction over those claims came to an end, when the government acknowledged that it could not support the decisions on the basis that the claims were made. When that occurred this Court lost all of the bases for an assertion of jurisdiction over all of the government's claims against the contractor. This included all CDA claims by virtue of the absence of any other Disputes Act type decisions and it also included this Court's jurisdiction over the government's fraud counterclaims under the False Claims Act and any relief under the Forfeiture statute.

Plaintiff's brief of May 23, 1994 pp. 9–10. Taken literally, this argument calls for the dismissal of the entire action, since Triad has no administrative claims of its own on appeal. That Triad would not be unhappy with that result is apparent from the position taken by Triad in oral argument that the CO had no authority to issue a default termination based on alleged fraud. This argument is based on the following language of 41 U.S.C. § 605(a): "This section shall not authorize any agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud."

■ The court is not troubled by either aspect of Triad's jurisdictional argument. As already held, it is the court's view that the CDA does not alter the general rule that a default termination can be supported based on newly-discovered fraud. Second, it is the court's view that the last sentence of section 605(a) at a minimum does not limit the CO's right to deny claims, terminate contracts for default, or issue affirmative government claims, at least insofar as the latter does not result in settlement of a contractor claim.

*Burden of Proof; Standard of Proof*

■ The defendant bears the burden of proving the correctness of the default termination. Although the notice of default termination was predicated solely on an asserted fraud by the contractor in certifying the training of its solderers, that issue was abandoned by the government prior to trial. Instead, the government attempted to sustain the default on two other grounds. The first was that the contractor had falsified the results of leak tests performed on the TVPCs. The second was that Triad fraudulently concealed from MICOM its discovery that the wrong type of soldering flux may have been used on completed units.

■ Fraud taints everything it touches. *Carrier Corp. v. United States*, 328 F.2d 328, 164 Ct.Cl. 666, 678 (1964). Consequently, proof of fraud by clear and convincing evidence is a ground for default termination. *Joseph Morton Co.*, 757 F.2d at 1278–79; *see United States v. Acme Process Equipment Co.*, 385 U.S. 138, 144–48, 87 S.Ct. 350, 354–56, 17 L.Ed.2d 249 (1966). Fraud is sufficient to vitiate acceptance of delivered contract goods. *See Universal Sportswear Inc. v. United States*, 180 F.Supp. 391, 145 Ct.Cl. 209, 214 (1959). On this basis, defendant seeks confirmation of the decision to default terminate, as well as return of payments made in excess of the value of completed units accepted.

■ The government also raises as a defense a special plea in fraud pursuant to 28 U.S.C. § 2514 (1988). The effect of this provision is to forfeit claims tainted by fraud. Such fraud consists of knowingly or recklessly making false statements with intent to deceive. *Ingalls Shipbuilding, Inc. v. United States*, 21 Cl.Ct. 117, 122 (1990). The defense must be established by clear and convincing evidence. *O'Brien Gear & Machine Co. v. United States*, 591 F.2d 666, 672, 219 Ct.Cl. 187, 199 (1979).

The government also seeks damages and penalties under the False Claims Act. 31 U.S.C. §§ 3729–3731 (Supp.IV 1992). For purposes of the act, the government must show that the contractor made false claims with actual knowledge, deliberate ignorance,

or reckless disregard of the truth. No specific intent to defraud is necessary. *Id.* at 3729(b). For the government to recover on its False Claims Act counterclaim it need only show fraud by a preponderance of the evidence. 31 U.S.C. § 3731(c).[2] The asserted false claims consist of the invoices submitted subsequent to December 1987. The government contends that Triad officials knew or had reason to know, or recklessly disregarded the fact, that TVPC units had passed the leak test only by deception, and that there had probably been non-conforming soldering. Units were shipped and invoiced despite knowledge of these facts by management officials.

It is unnecessary for the court to determine what part of the relief the government seeks can be granted as part of the false claims counterclaim, and how much flows from finding fraudulent breach of contract or a forfeiture. For the reasons set forth below, the court finds that there was clear and convincing evidence of fraud. It consisted of making claims that the contractor knew or should have known, but for reckless disregard of the truth, were false; specifically, that requests for payment were made with an intent to deceive the government into a belief that the contractor had fully complied with terms of the contract, when in fact it had not.

*Soldering*

■ The contract drawings required that hand-soldering comply with MIL–STD–45743, "using finding No. 43." Finding No. 43 in turn required use of wire solder composed of 60 percent lead wrapped around an RMA flux core. There is a difference between RMA flux (resin mildly active) and RA flux (resin active). Military specifications do not permit the use of RA flux on hand-soldered stranded wires. Even if an effort is made to clean the flux off the wire, it can never be completely removed. During the soldering process, flux is "wicked" up the wire under the plastic or teflon coating. Be-

cause RA flux is active, it eventually reacts with the metal of the wire and causes corrosion. It is impossible to tell from a visual inspection which type of solder was used.

The specifications did not preclude use of solder containing RA flux on machine-soldered components that went through the wave solder machine. A circuit board onto which the components were to be welded passed on a conveyor belt through the machine. The board and components were exposed to RA flux and the machine automatically applied solder at the appropriate points. There is no contention that Triad did not follow specifications in this operation.

MICOM attempted at trial to prove that RA flux was improperly used at some point in hand soldering. There is no physical proof that any devices furnished by Triad contained stranded wire soldered using RA flux. Instead, defendant offered the testimony of Kathy Crabtree and Charles Cunningham. Crabtree worked at Triad for several months in 1987. She was a quality control inspector assigned to all parts of the assembly. She was assigned to the second, and for a brief period, to the third shift. She left Triad because of continuing disagreements with her supervisors about whether the defects she was finding in fact warranted rejection or rework.

Crabtree testified that RA flux solder was used to tin stranded wires. This was done at the tinning station, where wires that would be hand soldered were tinned. It was also used to do touch up and repair work on the TVPCs. Crabtree expressed her concerns about the use of RA flux solder to her supervisors, Sara Caldwell and Justin Stoffer. She had seen evidence of RA flux being "wicked" under the insulation, and causing burning on the boards and components. The RA flux was "continuously" causing contamination that should have led to rejection. Tr. 261. Caldwell and Stoffer were unsympathetic and suggested she was being too picky.

---

2. The lower standard of proof was the result of amendments to the False Claims Act adopted in 1986. Triad argues that the higher threshold of proof that predates the amendments applies here, on the theory that the relevant activities had their genesis in the contract formation peri-

od. That is incorrect. Both the activities that are alleged to constitute the underlying fraud and the false claims occurred in 1987–88. The later legislation thus controls. In any event, the issue is moot, because the court is satisfied that the higher standard is met.

Although the RA flux solder was left out at the work stations, employees were instructed to conceal it when visitors came to the plant. The employees would be herded into the "trailer" until the visitors or inspector had left. That the use of RA flux was not seen as permissible is evident from the supervisors' instructions: "Generally you'd hear the supervisor or lead person, and this happened a few times, say 'we're having visitors, clean up your work stations. Bring your flux bottles up here,' and they put other flux out." *Id.* at 262–63.

Charles Cunningham is an industrial engineer. He worked at Triad beginning in early December 1987, when the plant was shutdown temporarily by MICOM. He was responsible for writing the new work process instructions embodied in the route sheets. Shortly after coming to work at Triad, Cunningham noticed that RA flux had been used at the tinning station and at the wave solder machine. He also noticed green growth consistent with copper corrosion on the tinned stranded wires kept in the storage room for use on the TVPC contract. He was concerned about his observation and brought it to the attention of plant manager Charlie Huggins. Huggins had conversations about the issue with Donald Yeager, a plant engineer, and John Danes, seeking counsel. He did not contact John Pacetti, who by this time had moved to Washington, D.C., and was concentrating on a new procurement contract Triad was seeking.

A weekly activity report for the week ending February 21, 1988, was sent to Huggins by Gary Lancaster, a Triad employee hired to assist Huggins with "program management." It reflects that Lancaster had been "[n]otified by Engineering of potential problem in TVPC program relating to past use of RA Flux. Discussed with plant manager. Decision was made to remove all [a]ffected materials still held in stock." Pl.Ex. 155. This was already well after Cunningham had first raised the problem.

The result was a decision to move the supply of tinned wires in the supply room to the "MRB" room. The MRB room is a secure area designated under the specifications to impound non-conforming goods to insure they will not be used to make contract goods. Triad does not contend that it notified MICOM of the concern about RA flux.[3] It also made no effort to recall shipped materials or to replace soldering in existing work in process. Some of that work in process was eventually shipped to MICOM in the form of completed TVPCs.

Cunningham testified that he suggested to Herbert Henchcliffe, Triad's quality manager, that MICOM should be notified that "product had been shipped with RA flux left in the stranded wires." Tr. 314. He was told to mind his own business.

Huggins attempted to minimize his concern about the RA flux issue and thereby explain why MICOM was not notified about the possibility of non-conforming goods. His explanation was singularly unsatisfactory. He testified that there was no proof that RA flux was used on the TVPC contract. Three facts contradict that assertion. First, Huggins testified that he was not "surprised" that RA flux was found at the tinning station. This was the case, he explained, because there were approximately ten other contracts being performed in the Huntsville plant at that time; on some of them RA flux could be used. He explained that Betty Pemberton, the individual who tinned wires, kept a cauldron of molten solder at her station, and that she could dip wires in the appropriate flux and then in the solder. The problem with that is that only roll solder was to be used for hand-tinning wires on the TVPC contract. In addition, work on the TVPC contract should have been segregated at all points to ensure non-contamination. The court concludes that the real reason Huggins was not surprised about the discovery of RA flux on the work floor is because he knew or strongly suspected it was being used for tinning and touch-up work on the TVPC contract.

A second discordant fact is that Huggins removed all the tinned wires despite his protestations that he was satisfied RA flux was

---

3. Even if the government received a list of MRB room inventory, this would be insufficient to put it on notice of a problem with completed units.

It would have been a simple matter to notify MICOM's Quality Assurance Representative.

not used. Such a step would be unwarranted unless he already suspected that TVPC wires were being tinned improperly. If he suspected that, of course, then MICOM should have been notified so Triad could get instructions or a waiver.

A final fact that is completely incompatible with an innocent explanation of events is Huggins' failure to ask Betty Pemberton whether in fact she was tinning wires for the TVPC contract. According to Huggins, she was the only person working at the tinning station. It is clear from Huggins' and Cunningham's testimony that the discovery caused quite a stir, and ultimately resulted in a wastage of work and material. Yet Huggins, when asked at trial if he bothered to ask Pemberton whether she was using RA flux, and if so, on which contract, said he had not. During trial, Huggins testified that "nobody knew what was going on [with] the flux on the floor." Tr. at 541. One person plainly would have, and that is Pemberton. The only explanation for Huggins' failure to discuss the situation with her, if in fact he did not,[4] is that Huggins knew what the answer would have been. Pemberton was listed by plaintiff as a witness at trial, but she was not called.

The court infers from all this that Huggins and Henchcliffe either knew or strongly suspected that RA flux was being used improperly on the TVPC contract. The court concludes that they made conscious decisions to keep from MICOM their suspicions about the use of RA flux, and that this was done in part because it is not possible to detect the difference visually. Their failure to notify the government was a concealment constituting a material breach of the contract.

*The Leak Test*

■ The chassis for the TVPC was manufactured for Triad by Shellcraft Industries. The chassis had to meet certain requirements concerning its physical integrity. Two of these were leak tests. The first is shown on Note 22 of Drawing 1206:

Leak test the power conditioner (TVPC) by pressurizing to 1.75 to 2.25 PSIG using dry air or nitrogen per BB–N–411 Type I, Class I, Grade B and submerging the TVPC in water to a depth of 3 to 10 inches. No leak point shall emit more than 1 bubble per minute while pressure is maintained at 1.75 psig to 2.25 psig for 3 minutes minimum. J1 [connector] shall be sealed to prevent water entering the pin cavities.

Drawing 1206 also refers to another drawing, number 1215. Drawing 1215 contains a note 7, "Impregnate per MIL–STD–276." That standard controls the procedures for "salvage of defective porous castings by impregnation" of nonferrous metal castings. The test procedures set out at ¶ 4.1.2.1.1 require that the casting be subjected to no less than "10 psi gage pressure. Air shall be forced into the castings at the required pressure while the casting is immersed in water. As an alternate, neutral soap solution or kerosene may be brushed on the external surfaces as a leak indicator." An alternate testing method allows the unit to be filled with water, kerosene, or other liquid.

During trial, Pacetti testified that the MIL–STD–276 test duplicated the leak test set out at Note 22. He also explained that Triad instructed Shellcraft to incorporate the Note 22 leak test as part of the casting requirements. Even if this occurred, it cannot be correct that the two tests duplicate each other or that Triad was absolved of its own responsibility to perform a leak test on the assembled chassis. The best evidence of this is Triad's implementation of its own leak test, which it incorporated into assembly immediately prior to final acceptance testing. The Triad testing was plainly done in an effort to meet the Note 22 requirements. Regardless of whether Triad and its supplier were in effect duplicating each other's work, there is no dispute that the Note 22 leak test remained in force, and that Triad understood it to apply to the assembled unit.[5]

---

4. Huggins was nervous, hesitant, and guarded when examined by government counsel, and professed to be unable to put in words the answers to simple questions. He was considerably more forthcoming when examined by Triad's counsel.

The court believes his answers were not completely candid and were conformed to fit an innocent explanation of events.

5. Evidence was introduced at trial that, early on in the contract, MICOM eliminated the reference

Pacetti testified at trial that there was some confusion about which acceptance tests the government would insist upon. On December 6, 1984, the Contracting Officer wrote Triad a letter in which the tests contained at Drawing 13221293 were eliminated, and Triad was invited to develop its own "screening and burn-in tests considered necessary for assuring performance." There can be no confusion, however, as to whether the leak test set out at Drawing 1206 was eliminated. It clearly was not. Triad apparently was not confused, as it implemented the leak test procedures.

Nor is it an answer to suggest, as Triad did, that the test is not critical, or that something less than 'perfection should have satisfied the government. Col. Devaney explained the environmental conditions the TVPC could experience and the potentially fatal consequences to military personnel if a unit fails.

The general procedure for conducting the leak test was described by several production workers, as well as by Joe Griggs, the production manager. Griggs provided a somewhat different picture than did the production workers with respect to the test procedure and also with respect to some critical issues of alleged fraud.

The main body of the chassis has a groove etched out along the top edge. An O-ring was to be seated in that groove to provide a good seal when the metal lid was secured. The lid was held in place with 22 screws. The O-rings came in packages that each contained several rings. The rings were dusted with talcum powder to keep them from sticking to each other. Griggs testified that when he arrived at the facility in Huntsville in January, Triad had been having a great deal

of difficulty getting the assembled chassis to pass the Note 22 leak test consistently. As Huggins explained, he was frequently faced with complaints about failures of the units. Griggs testified that the failure rate was "very high."

When Griggs began working at Triad, it was already the practice, at least occasionally, to use vaseline petroleum jelly if the unit failed the leak test, ostensibly to remove talcum. Because those units with O-rings cleaned by vaseline seemed to fare better in the leak test, Griggs had one of his engineers check with the manufacturer of the O-ring to see if vaseline was compatible with the rubber ring. Yeager reported back that vaseline could be used, and Griggs then instituted a process of cleaning and lubricating the O-ring earlier in the production process.

Once the machines were ready for final inspection (with lids off), Griggs described the process as follows: the O-rings were cleaned with a small amount of vaseline; the ring was then wiped with a "Kim-wipe" to remove excess vaseline; the lid was attached with a minimum number of screws; the machine went through a pre-burn-in test for five to seven minutes; the rest of the screws were installed; the full-blown burn-in test was performed; and then the device was sent to be leak tested. Griggs said he institutionalized this use of vaseline before the leak test; however, it was never made part of the production steps outlined on the route sheets.

The leak test itself consisted of the submersion of the pressurized, closed chassis in water for not less than three minutes. Griggs recalled that the standard applied was no more than three bubbles in three minutes from any one leak point.[6] He testi-

---

in drawing 1206 to the direction in note 27 to assemble "to meet factory acceptance test procedure 13221293 ["1293"]." The thrust of plaintiff's evidence in this connection is that by eliminating the requirements of procedure 1293, the government waived its rights to insist on performance of other testing requirements. Although it is true that MICOM may have taken an unduly laissez faire approach in communicating what it was planning in terms of tests to replace those of procedure 1293, the leak test was not affected. Procedure 1293 is specific to electronic performance. It has nothing to do with leak tests of the chassis. Triad's own conduct belies any sug-

gestion that it was under the impression that it did not have to follow note 22.

**6.** Note 22 states that "no leak point shall emit more than 1 bubble per minute while pressure is maintained." Crabtree testified that she recalled a standard of three bubbles per minute. If the plaintiff on occasion applied a more stringent test than called for by Note 22, it cannot complain now that it is not possible to determine if the machines would have met a lower threshold test. The fact that vaseline was used to conceal leaks precludes such an argument.

fied that if the machine failed, it would be "written up" and sent back for reworking to some earlier step in the production process. He also implied, however, that lids would sometimes be taken off at the point of failure for reworking the seal, in the event it was pinched.

The relatively benign description offered by Griggs and Huggins is fundamentally at odds with that provided by the production workers. The story they tell is of the application of vaseline *after* a failed leak test, not before, and for purposes other than mere cleaning of talcum powder.

John Ashworth worked briefly at Triad toward the end of 1987 and the beginning of 1988. He started out doing soldering touch-up work and switched to second shift assembly work on the TVPC. His job, along with four or five others on the shift, was to assemble the units and then leak test them.[7] Ashworth stated that he was told by Griggs to apply vaseline if a unit failed the leak test. Rather than being sent back to some earlier assembly stage, the units would be opened up as part of the leak test procedure, to apply vaseline. If it still leaked, the top would be removed, more vaseline applied, and the machine tested again. This was the only "remedial" work done on leaking units after a first or second failure. He said that government inspectors would not be present during the second shift. He also said that leaks would sometimes be noticed at the J2 electrical connector points on the unit, and that superglue would be used to make a seal. He was not told to use vaseline to clean O-rings; there was no process for doing so.

This version is corroborated by others. Evelyn Sledge worked at Triad for two years, leaving in November or December 1987. Among other items of work, she performed the leak test. Her supervisor was Justin Stoffer; her foreman was Sandy Tabor. When she and others arrived at the leak test area on their shift, they would find completed units on a rack and, frequently,

other units on the work table that needed to have lids installed. Once the workers had a completely assembled unit, they would submerge it. This was without vaseline on the O-ring. As she put it, "We tried to do it the right way first. If it didn't work the first time, that's when we would put the vaseline on it." Tr. 218. If that did not work, they would open up the units, smear vaseline around the top of the main chassis, reseal the unit, and test it again. Sledge testified that she was told by Sandy Tabor that the reason for the vaseline was to "pass the leak test." That the use was seen as improper appears from other instructions: "When we put the vaseline around the rubber, when we got through with them[, ']make sure we put it back in our toolbox so that DCAS [Defense Contract Administrative Services] won't see it.[']" Tr. 220. She was told by Sandy Tabor that use of vaseline was "contrary to the contract." Tr. 224. Unlike Ashworth, however, Sledge did clean the O-ring with vaseline before seating in the chassis.

Cecelia Hampton worked as an assembler at Triad for a little over a year during the period 1987 and 1988. She testified that Sandy Tabor and Justin Stoffer instructed her, over her protest, to sign the route sheet for items of work performed by others earlier in the process. She also testified that vaseline was only used if the units failed the leak test. The first time a unit she tested leaked bubbles, she asked Sandy Tabor for instructions: "[S]he said, take the screws out, put vaseline on the rubber ring that goes around it, and then torque it back down and then try it again." Tr. 236. Hampton referred to this as a "customary practice." *Id.* If the unit failed again, more vaseline was applied. Sometimes the vaseline was so thick it oozed out the seam between the chassis and lid. If a unit failed twice, she would give it to Stoffer or Tabor. Like Sledge, she was told to hide the vaseline if government inspectors came by. "Whenever ... a Government inspector was coming, they said hide it because we don't want them

---

7. Ashworth testified that he did not participate in any burn-in test. If one was done, it was done, and the lid then removed, before he did his own assembly. The assemblers on his shift took the O-rings from plastic bags and put them into the

groove in the chassis. They did nothing to the O-ring before installing it. None of the other assembly-line witnesses referred to doing a burn-in test before putting the unit together.

to find vaseline out on the floor." Tr. 237. She was never observed in the process of putting in O-rings or putting on vaseline by government inspectors.

Kathy Crabtree also spent time on the assembly line, including some time on the second shift. She confirmed that vaseline was not used until a unit had failed the leak test: "[I]t wasn't used until it was leak tested, then when it was rejected [vaseline] would be slopped around the seal and the gasket and the lid of the unit." Tr. 264. If the unit failed a second time it might be sent back for repair, or it might be opened up again for application of more vaseline. Her supervisors were Joe Griggs and Sara Caldwell. When she questioned the amount of vaseline being used to seal the units, Crabtree was told it was being used to clean powder off the rings. In view of the multiple applications, she found this difficult to credit. Apparently Crabtree was marking some of the failures as rejects on the route sheets, because at one point she was told not to mark the units as rejected, but instead to send them back to the repair unit. She was also told she nitpicked in doing her inspections. Eventually, no leak testing was done during the second shift.

■ Douglas Garner, a former DCAS Supervisory Quality Assurance Representative ("QAR"), was hired on a consulting basis by Triad in 1988 to advise the company on how to upgrade the plant to meet stricter MIL spec standards. He was generally familiar with procedures in place for quality control, although he had very little first hand exposure to production. He testified that the back of the route sheet was to be used to report test failures. That method would perhaps be adequate to warn the QAR of failures and corrections, if that procedure was followed. And John Pacetti testified that it is possible to use the work cards to trace specific machines that had problems passing the leak test. None of this is adequate to overcome concealment, however. If the failures are simply not noted, as the court finds

they were not during at least a portion of the contract period, then having a system in place to record failures is irrelevant.[8]

■ Nor is Triad's obligation diminished by the presence at its production facility of MICOM's QAR. There was no direct evidence that any of the applications of vaseline were witnessed by the QAR. *See also* FAR § 52.246–2(b). The government did not participate in the final acceptance testing; it had to rely on Triad's representations. Moreover, while Triad tried to minimize the usefulness of the leak test, Col. Devaney's testimony went unrebutted. The court cannot rewrite the specifications based on the contractor's assessment of the quality standards.

There is no possible innocent explanation for the actions of Triad employees and supervisors in connection with the actions described by Ashworth, Sledge, Hampton, and Crabtree. The court found these individuals to be credible. The court was not impressed with the credibility of Huggins and Griggs, on the other hand. In part this is because of their courtroom demeanor and in part due to the inconsistencies over time in Triad's explanation of the use of vaseline.

The court is persuaded that on units that initially failed the leak test, vaseline was applied at two stages of production. It was applied, in varying degrees of regularity, before the burn-in test. Any innocent explanation of vaseline use as a lubricant or "cleaner" attaches to this use, although even at this stage the contractor had an obligation to call attention to the additional step by modifying in writing the routing sheets. The pernicious use occurred when the vaseline was applied to units failing the leak test. There was no pretense at this point that the vaseline was used to help the O-ring seat better, or to clean off talcum powder. The sole purpose of liberal applications of vaseline was to avoid the effects of a failed, and unrecorded, leak test.

---

8. Folders containing certain groups of route sheets or units known to have been shipped indicated "leaks" on the folder cover. Charles Huggins was, however, unable to find any indica-

tion of a leak test failure notation on the route sheets themselves, the documents the government inspectors would have seen.

*Reliance and damage*

■ What has been found thus far establishes the contractor's breach of a material duty and knowledge of management officials who acted with intent to deceive the government.[9] Nor can there be any question that MICOM relied on the representations implicit in the invoices that the TVPCs in fact met contract specifications. MICOM accepted over 600 of the units for use in the field. Some of these were shipped after December 1987. The court finds that the fraud was therefore material.

■ The government also put on evidence that, because of its concerns with the integrity of the units, MICOM chose to disassemble and test the completed units. Over 600 TVPCs were shipped to Anniston Army Depot, where they were taken apart and subjected to testing and repairs as needed. In addition, MICOM took the opportunity to make a minor redesign. A small foam pad was installed on the lid of the TVPC to reduce vibration. Jane Gowens, a maintenance management specialist at the Depot, testified concerning the costs of the testing and repairs. She explained, from bookkeeping records, that $240,714.74 was expended by the Depot. The government was therefore damaged by the fraud.

■ The government seeks to recover these repair costs as part of its False Claims Act counterclaim. The government has not claimed for material costs of any kind in connection with the testing and repair. The court is satisfied with the evidence of damage as to this claim, with one exception. As noted above, one of the items of work performed during testing and repair was the installation of the foam pad. Although the court is persuaded that the additional labor associated with gluing the pad on while the machine was open was de minimis, the government had the burden of establishing the amount with more specificity. It failed to do so. The court limits the government's recovery on this claim to $200,000.[10]

■ With respect to the recovery of unliquidated progress payments under the forfeiture counterclaim, the relevant exhibits were not comprehensible to the court or the designated witness. The court was dissatisfied with the testimony. The court limits the government's recovery to $5,602,177.36, the difference between the amount plaintiff admits Triad received and the amount stipulated by plaintiff as the value of the delivered units.

*Other considerations*

■ Triad urges the court, even if fraud is found, to consider the contractor's overall willingness to perform to high standards, the lack of evidence of any involvement by the president of the company, as well as the difficulties created by the 67 deviations and waivers, the sloppiness of the TDP, and the imprecise testing requirements. Unfortunately for plaintiff, however, the court is not permitted to "balance" the effect of fraud against otherwise good performance or motives. *Joseph Morton Co.*, 757 F.2d at 1278. Fraud taints the entire contract.

9. None of the evidence at all suggested involvement by Mr. Pacetti. As Plant Manager, Production Manager, Quality Assurance Manager, and Supervisors, Huggins, Griggs, Henchcliffe, Stoffer, Caldwell, and Tabor sufficiently implicated company management.

10. During post-trial argument, plaintiff contended that imprecision as to the amount spent on installation of the foam pad precludes any recovery of damages by defendant. Plaintiff points to the line of authority in this circuit that jury verdict assessments of damages are disfavored. *See, e.g., Dawco Const. Inc. v. United States*, 930 F.2d 872, 881 n. 3 (Fed.Cir.1991); *W.R.B. Corp. v. United States*, 183 Ct.Cl. 409, 425, 1968 WL 9146 (1968). As the *Dawco* court points out, however, the real concern is that "unrealistic assumptions will be adopted and extrapolated, greatly multiplying an award beyond reason, and rewarding preparers of imprecise claims based on undocumented costs with unjustified windfalls." 930 F.2d at 882. Here, the total magnitude of the repair costs is not seriously in dispute. There is no danger of speculation in that regard. Richard Ray testified that every machine had to be opened for repairs. Whatever labor was involved beyond the gluing of the foam pad therefore would have occurred in any event. Under the circumstances, the reduction by the court penalizes the government, not the plaintiff. *See, Brand Inv. Co. v. United States*, 58 F.Supp. 749, 102 Ct.Cl. 40, 45 (1944), *cert. denied*, 324 U.S. 850, 65 S.Ct. 684, 89 L.Ed. 1410 (1945).

■ In sum, though MICOM must accept responsibility for the sloppiness of TDP and much of the frustration Triad experienced in coping with 67 deviations and waivers and imprecise testing requirements, the unalterable fact remains that none of this would excuse fraud. Units certified as meeting contract requirements were required to pass the leak test and Triad was obligated to report results of testing failures and efforts to remedy failing units. The use of vaseline constituted an intentional deception to get around these requirements. Triad was also obligated to report the possibility of nonconforming soldering and deliberately chose not to.

### The work in process

■ At the close of the pretrial conference, the court asked the parties whether the value of the work in process and the parts was part of the trial. Triad contended that it was, arguing that it was a setoff that had to be tried as part of the appeal of the government's monetary claim. The government disagreed. The court ordered that the question of title to the work in process and parts would be tried, although the question of valuation was put off. In retrospect, this ruling was in error, as became apparent during post-trial argument. There is no question that Triad does not have pending before the court an appeal of a claim to the CO for the value of those materials.[11] Nor was the value of work in process part of the government's claim for unliquidated progress payments, because the alleged seizure of those materials occurred later. The question is whether a separate claim by either party is necessary to bring the question of an offset before the court, or whether the offset value of work in process and parts is more correctly viewed as a defense to the pending government monetary claim.

The answer depends on the meaning of the applicable default regulations, found at 48 C.F.R. § 52.249–8. Subparagraph (e) provides that upon default termination, the government may require the contractor to transfer title to completed supplies and to manufacturing materials, which include parts and work in process. Subparagraph (f) directs that the government "shall pay contract price" for completed supplies. As to manufacturing materials, the parties are required to attempt to negotiate a value. Failing that, "a dispute under the Disputes clause" arises.

■ The overall scheme of § 52.249–8 plainly assumes that the government is obligated to pay for that which it accepts, including work in process and parts. It would also appear that any obligation to pay for accepted product or materials is an offset against any amount the government would otherwise be entitled to as unliquidated progress payments. The theory behind the government's affirmative claim assumes a netting out of debits and credits. The court cannot ignore, however, the fact that the regulations treat manufacturing materials differently than completed units. At the time of issuance of the government claims and as late as the time of filing the complaint, the manufacturing materials in question were not in the government's possession or control. There would have been no obligation to go through the negotiation contemplated by subparagraph (f) as to manufacturing materials. Events subsequent to the claim and the complaint cannot add to the jurisdiction defined by the claims appealed. Although in typical circumstances both accepted completed units and accepted work in process and parts would be implicit offsets to a government claim for return of unliquidated progress payments, subparagraph (f) plainly contemplates that the value of the manufacturing materials or even the fact of their acceptance can be a dispute separate from such a claim.[12] In any event, under the present circumstances, the court has before it only the government's demand for unliquidated

---

11. During post trial oral argument, however, counsel for Triad stated that a claim for the offset value of those materials is pending before the CO.

12. The court recognizes that dealing with manufacturing materials as a separate claim creates the possibility of the nominal appearance of an affirmative contractor claim. The substance of the inquiry, however, would remain the same, namely, how much of an offset against overpayments is the contractor entitled to?

progress payments, offset by accepted product. Accordingly, there is no occasion for the court to deal with the question of title to the manufacturing materials. A ruling on that issue would be gratuitous.

For similar reasons, however, there is no basis for considering the effect of the Forfeiture Statute, 28 U.S.C. 2514 (1988). In the event a claimant against the United States engages in fraud in the "proof, statement, establishment, or allowance" of a claim, the claim is forfeited. *Id. See also Martin J. Simko Const., Inc. v. United States,* 852 F.2d 540, 548 (Fed.Cir.1988). The question here is, what constitutes the claim? Defendant urges that the court apply the Forfeiture Statute to two "claims." The first, it urges, is "the trustee's assertion that it is entitled to retain progress payments that Triad received as a result of its submission of falsified progress payment requests." Brief of June 10, 1994, p. 7. Triad suggests that what defendant construes as a claim is really a defense to the government's claim of a right to default terminate and to its demand for unliquidated progress payments.

Defendant is correct that the term "claim" as used in the Forfeiture Statute is more comprehensive than the term used in the Contract Disputes Act. It embraces any claim asserted in this court by a plaintiff. In the view of the court, however, the Forfeiture Statute has no application when a contractor is only attempting to negate a government claim under the CDA. In interpreting the predecessor to section 2514, the Court of Claims in *F.B. Crovo, Jr. & Co. v. United States,* 100 Ct.Cl. 368, 1943 WL 4311 (1943), wrote that the statute "is obviously aimed at fraud committed for the purpose of securing the payment of a claim." *Id.* at 370. Although *Tyger Const. Co. Inc. v. United States,* 28 Fed.Cl. 35, 60–62 (1993), indicates that the fraud does not have to occur in the court proceeding itself, it plainly has to be relevant to the present assertion of a claim in court, arising out of the same transaction or contract. *See Little v. United States,* 152 F.Supp. 84, 138 Ct.Cl. 773, 778 (1957).

With respect to the first "claim," nothing is gained analytically by treating Triad's response to the government's claims as a separate claim for purposes of the Forfeiture Statute. The same fraud that might otherwise vitiate an affirmative claim by a contractor through the device of the Forfeiture Act could thwart the contractor's effort to avoid a default termination justified on the basis of fraud. Because the court finds fraud sufficient to sustain the default termination, Triad also fails in its defense to the demand for repayment of unliquidated progress payments. It adds nothing other than confusion to say that Triad was advancing a claim that is now forfeited.

The defendant also proposes that the court forfeit "future claims for compensation, including a claim to be compensated for the manufacturing materials." *Id.* Brief of June 10, 1994, p. 7. As discussed above, the court has misgivings about defendant's implicit characterization of a contractor claim for the offset value of manufacturing materials as an affirmative claim subject to forfeiture. In any event, as defendant concedes, the "Court does not presently possess subject matter jurisdiction to decide the value of manufacturing materials because ... [that] still must be the subject of a contracting officer's final decision." *Id.* There is not pending before the court an appeal from the denial of such a claim at an administrative level so there is no claim to forfeit.

## CONCLUSION

The court sustains the default. The government is entitled to the difference between the amounts paid and the value of delivered units, $5,602,177.36. In addition, the court finds that the government is entitled to $5,000 as a civil penalty against Triad under the False Claims Act, along with $600,000, three times the damages it suffered. The Clerk is directed to enter judgment for defendant accordingly.[13] Costs to defendant.

---

**13.** The suspension in companion docket number 90–3958C is hereby lifted. The grounds for re-

lief, and the relief sought, are disposed of in this opinion. Accordingly, these actions are consoli-

