**BMY—COMBAT SYSTEMS DIVISION OF HARSCO CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 90–252 C.

United States Court of Federal Claims.

May 23, 1997.

Wilsie H. Adams, Jr., McKenna & Cuneo, Washington, DC, for plaintiff, with whom was Alexander J. Brittin, Jacob B. Pankow-

ski, Kurt J. Hamrock, McKenna & Cuneo, Washington, DC, of counsel.

Carolyn G. Mark, Washington, DC, for defendant, with whom was Joseph Terz, Assistant U.S. Attorney, of counsel.

## OPINION

MOODY R. TIDWELL, III, Judge:

Plaintiff filed suit in this court in 1990 seeking an equitable adjustment to its contract with the United States. Defendant asserts counterclaims under the False Claims Act, 31 U.S.C. § 3729 (1994), a special plea in fraud pursuant to 28 U.S.C. § 2514 (1994), and breach of contract. The court has jurisdiction to entertain this matter pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1994). This opinion follows a trial on liability held in Washington, D.C. from July 8 to July 29, 1996. Quantum was not considered. For the reasons set forth below, the court denies plaintiff's claim for an equitable adjustment, allows defendant's False Claims Act and breach of contract counterclaims, and denies defendant's special plea in fraud counterclaim.

## FACTS

Plaintiff, BMY—Combat Systems (BMY), is an unincorporated division of Harsco Corporation that designs, manufactures and sells combat weapons systems, including self-propelled howitzers. BMY began manufacturing M109A2 howitzers for the United States Army (the government or defendant) in 1972. The parties executed the contract at issue, Contract DAAA09–82–G–5811 (contract 5811), to BMY on November 15, 1984. Contract 5811 called for production of 123 howitzers under the base contract, with an additional 70 howitzers under an option. The government later increased the number of howitzers ordered under contract 5811 to 305. The total price was $107,043,177.58.

BMY would present each howitzer to a Defense Contract Administration Service (DCAS) official for review. After completion of final general inspection, BMY would submit to the DCAS representative a DD250 form, a government form prepared by BMY. The DD250 served as an acceptance form and was signed only by the DCAS representative. After signature and upon receipt of shipping instructions, the vehicles would be prepared for shipment. At that time, plaintiff prepared a second DD250 form to invoice the government for shipping costs. Although plaintiff executed Certificates of Conformance (COCs), the COCs were never provided to defendant.

Each M109A2 howitzer has a trunnion mounting bracket (TMB). The TMB is a large steel casting weighing several thousand pounds that is bolted to the cab of the howitzer. It attaches the howitzer to a vehicle and is an important component because the cannon is mounted through and secured in place by the TMB. Specifications for the TMB were set forth in TMB drawings and a TMB supplemental quality assurance provision (SQAP) deemed incorporated into contract 5811.

Contract 5811 required that TMBs undergo radiographic (RT) inspection to determine the internal soundness of the casting by detecting internal discontinuities. The RT inspection requirements were set forth on the TMB drawing, the TMB SQAP, and the radiographic position chart. The TMB SQAP specified an AQL of zero, which meant that each TMB must be RT inspected (100% inspection). Notably, prior M109A2 howitzer contracts between BMY and the government included clauses that required radiographic inspections for "one control casting . . . out of each thirty produced." Joint Ex. 21 at 32 (Contract DAAF03–73–C–0028); Joint Ex. 22 at 79 (Contract DAAA09–77–C–2035). Contract 5811, however, does not contain this clause and, as a result, it requires the contractor to conduct 100% RT inspection.

Contract 5811 also required the contractor to perform magnetic particle (MT) inspection to detect any discontinuities on the TMB's surface. In the notes on the TMB drawing, MT inspection is required "in accordance with spec Mil–M–11472, cracks & hot tears unacceptable." Joint Ex. 27 (Enlargement of Notes from TMB Drawings). The TMB SQAP specifies that the MT inspection AQL is also zero, which means that each TMB must be MT inspected (100% MT inspection).

In addition, the SQAPs listed seven major dimensional characteristics and seventeen minor characteristics that the contractor was required to inspect on the TMB. The contract placed no requirement on the government to perform any inspection or testing of the TMBs.

During the administration of contract 5811 and two of plaintiff's prior contracts, plaintiff purchased well in excess of 1000 TMBs from five different foundries over a period of more than fifteen years. Plaintiff awarded Purchase Order No. G003893-7 to the Adirondack Steel Casting Company (ASC) on November 1, 1984, for the manufacture of TMBs under contract 5811, for a price of $2,207 per TMB. The Purchase Order specified that ASC was to manufacture 123 TMBs at a total price of $271,461. Plaintiff accompanied the Purchase Order with the TMB SQAPs, drawings and specifications and provided ASC with its Procurement Instructions and Requirements Manual. On January 1, 1985, plaintiff issued Change Order No. 1 to the Purchase Order, whereby plaintiff increased the quantity of TMBs from 123 to 193, thus increasing the total cost of the Purchase Order to $425,951.

Plaintiff first purchased TMBs from ASC during performance of contract DAA09-77-2035, the government contract that preceded contract 5811. At that time, plaintiff discovered numerous discontinuities in the ASC castings. Due to the numerous deficiencies, plaintiff found itself returning a high percentage of the TMBs to ASC for repair. Although ASC made modifications and corrected most of the problems, the TMBs still possessed defects. In particular, plaintiff began to discover discontinuities in the rail areas of the TMBs in 1985 while in production for contract 2035. The rails are bolted to the vehicle to hold the TMB in place. Plaintiff discovered these discontinuities after the rough castings received from ASC were machined by plaintiff's employees. In spite of ASC's MT inspection of the rails, plaintiff found 45% of the 60 TMBs to have discontinuities in the rails. The MT inspection failed to detect subsurface discontinuities that became apparent after the excess material was removed during machining. In April 1985, plaintiff requested that ASC perform extra radiographs of the rail areas of each TMB in order to detect subsurface discontinuities.

Plaintiff's Quality Assurance Department launched an investigation into the causes for the repeated problems with the rail areas in the TMBs manufactured by ASC. As a result, ASC was required to take four radiographic shots of the rail areas and, if discontinuities were encountered, ASC would repair or replace the TMBs prior to shipment to plaintiff. Change Order No. 3 also imposed BMY source inspection on several TMBs that plaintiff had returned to ASC for repair. The BMY source inspection meant that ASC could not ship repaired TMBs to BMY until a BMY representative reviewed them.

During the subsequent performance of contract 5811, in spite of the additional radiographic shots taken, plaintiff continued to uncover a variety of discontinuities. It is important to note, however, that discontinuities in the journal bearing areas of the TMB were not discovered at this time.

By July 1986, plaintiff knew of ASC's noncompliance with the 100% RT and MT inspection requirements, particularly with respect to the journal bearing areas. On April 23-25, 1986, Albert Luckenbaugh, a BMY Quality Assurance Engineer, visited ASC to conduct source inspection. During this April 1986 visit, Luckenbaugh reviewed the radiographic film of the rail areas of the repaired TMBs. In addition, Luckenbaugh asked ASC personnel to provide him with the radiographic film of the TMB journal bearing areas. Each TMB contains two journal bearing areas that are approximately four inches thick, and are required by contract to undergo 100% RT and MT inspection. ASC's quality control manager, Jerry Berkley, told Luckenbaugh that the radiographic film of the journal bearing area was not available at that time, but that ASC would locate it and make it available at a later time. During the visit, an ASC employee inquired into the meaning of an AQL of zero for RT and MT inspection. In his April 1986 Trip Report, Luckenbaugh noted ASC's failure to provide the radiographic film. This report was dis-

tributed to BMY directors, managers and employees.

Luckenbaugh returned to ASC on June 18–20, June 23–27, and July 14–17, 1986. He prepared a Trip Report for these visits, indicating that he discussed the TMB with ASC personnel. Attached to the June/July Trip Report was a copy of a letter dated July 7, 1986, from Joseph Korff, ASC Vice–President, addressed to Betty Carlson, the BMY castings buyer who administered the ASC TMB purchase order. This letter stated that:

> In April [1986] BMY interpreted the SQAPS to mean that 100% of the castings require radiography. This is a new twist for us and it is not reflected in our current pricing. Is the foundry responsible for performing radiography or is BMY responsible for it, as the SQAPS, the position chart, and the inspection characteristic indicates that the requirements are imposed on a finished part as opposed to a rough casting.

Joint Ex. 91 (Letter to Carlson from Korff dated July 7, 1986. regarding TMBs). This letter was distributed internally to ASC personnel, and was distributed to BMY personnel through the June/July Trip Report. Luckenbaugh's report on the BMY June/July 1986 trip to ASC also referred to the lack of 100% RT inspection performed by ASC. Luckenbaugh stated:

> AD [Adirondack Steel Casting Company] process sheet listed the [radiographic] frequency as 1 in 30.... I stated that in my opinion a thorough review of each part was not being performed. Comments received were, "Some fall through the cracks."
>
> 7. Part number 10956156, trunnion, was discussed briefly. (See attached letter from J. Korff to B. Carlson). It is unclear to this writer how the requirements can be unclear to AD. This item will have to be addressed by BMY Engineering and Purchasing departments.

Joint Ex. 92 (Luckenbaugh's Trip Report dated June 18–20, 23–27, and July 14–17, 1986, with letter from Korff attached).

Upon discovering that ASC was only radiographing the TMBs on a periodic basis, Luckenbaugh immediately brought the contract requirement that each TMB must be radiographed to ASC's attention. The Korff letter and the June/July 1986 trip report make it readily apparent that plaintiff knew of ASC's noncompliance with the 100% RT requirement as of July 1986. Plaintiff never provided ASC with a written response to any of the issues raised in the Korff letter.

Luckenbaugh returned to ASC on several occasions after his June/July 1986 visits. These include twelve visits between September 1986 and August 1987, for which there is no documentation that he addressed the RT and MT inspections of the TMBs or the Korff letter issues with ASC. BMY representatives James Bortner and Betty Carlson also visited ASC in the months following the June/July 1986 Trip Report and the Korff letter. Both Bortner and Carlson prepared trip reports, but their reports mentioned neither the RT and MT inspection of the TMBs, nor the issues raised in the Korff letter. The parties did conduct program or contract status review meetings to address issues relating to the contract. These were designed to address a wide range of technical issues and problems. Several program status review meetings took place between April 1986 and November 1987.

By the end of July 1986, plaintiff had accepted approximately 118 ASC TMBs for use in contract 5811 vehicles and had completed production of at least fifty howitzers that contained ASC TMBs. After July 1986, plaintiff continued to maintain its system of records the ASC COCs had accompanied each TMB delivered to plaintiff up to that month. The ASC COCs certified that "all materials used in the manufacture of parts called for in your Purchase Order No. Received by you from Adirondack Steel Casting Co., Inc, comply to the material and/or manufacturing specifications indicated in drawings and specifications."

On June 10, 1988, DCAS asked plaintiff to allow DCAS to observe plaintiff's inspectors conducting the TMB's dimensional inspections. On August 29, 1988, DCAS observed plaintiff inspecting the dimensional characteristics on a TMB which did not pass inspection. That same day, DCAS asked for and

received from plaintiff's inspectors the complete records for the dimensional inspections performed on TMBs. On August 31, 1988, DCAS and plaintiff had a meeting to discuss the deficiencies that came to light on August 29, 1988, regarding plaintiff's failure to inspect all the required dimensional characteristics. At that meeting, plaintiff confirmed that: (1) not all SQAP characteristics were being inspected; (2) some characteristics plaintiff documented as acceptable could not be verified in a manner acceptable to DCAS; and (3) the BMY form 45–9s[1] were incomplete.

As a result of plaintiff's failure to perform all required dimensional inspections on the TMBs, plaintiff submitted to defendant a Request for Waiver (RFW) on September 13, 1988. Plaintiff asked defendant to accept the TMBs "with no evidence of major SQAP characteristics being inspected since the start of production and with out-of-tolerance conditions." The RFW encompassed all 305 vehicles produced under contract 5811.

In October 1988, BMY reported to defendant that it had completed the MT inspection and dimensional inspection of ASC TMBs located in the Initial Production Test and Comparison Test howitzers. These TMBs failed to pass the dimensional inspections. On November 7, 1988, the contracting officer disapproved plaintiff's RFW based on discrepancies and nonconformances not addressed in the request. Subsequently, defendant directed plaintiff to make RT and MT inspection results available for every contract 5811 TMB. If this could not be done, the TMBs would have to be inspected.

By letter dated March 27, 1989, defendant directed plaintiff to remove and inspect TMBs in the howitzers that did not have 100% inspection data. Plaintiff informed defendant that 191 of the 305 ASC TMBs had incomplete data. Based on findings of defects and nonconformances in the ASC TMBs, defendant issued a safety of use message on April 21, 1989, to its military units with M109A2 howitzers produced under contract 5811. The howitzers were deadlined

until inspections could be conducted and the defective TMBs could be replaced.[2] BMY proposed using portable radiographic equipment as a means to field test howitzers quickly without the necessity of removing the TMBs from the howitzers. Plaintiff agreed to x-ray 25 howitzers still at BMY that were bound for Korea, using the portable equipment. TMBs not passing inspection would be replaced. The parties met on May 5, 1989, and signed a Memorandum of Agreement (MOA) which set forth the field RT inspection criteria and the actions to be taken while conducting the RT inspections. Because MT inspection could not be performed in the field, the United States did not direct MT inspections to be undertaken concurrently with the field RT effort. Defendant did require BMY to RT and MT inspect the TMBs in the twenty-five howitzers remaining at BMY, which BMY did during May and June 1989. As a result of the field x-ray of the TMBs, the United States directed BMY to replace 76 of the 191 ASC TMBs.

## DISCUSSION

### I. Plaintiff's Claim: Equitable Adjustment

Plaintiff claims that it is entitled to an equitable adjustment, arguing that it should receive additional payment for work performed on the howitzers after acceptance. Plaintiff argues it is entitled to this because: (1) the government accepted plaintiff's work on the howitzers; (2) plaintiff was directed to and did perform further work after final acceptance; and (3) plaintiff completed the additional work and incurred additional cost.

Plaintiff cites *Stewart Avionics* for the proposition that a contractor is entitled to compensation for any work performed at the direction of the contracting officer on items which have previously been accepted by the government. *See Appeal of Stewart Avionics, Inc.*, 75–1 BCA (CCH) ¶ 11,253, 1975 WL 1771 (A.S.B.C.A. April 15, 1975). Thus, the issue that plaintiff presents is whether the

---

1. BMY form 45–9s were forms kept in plaintiff's files, indicating that dimensional inspections had been performed.

2. The term "deadline" in this context means to halt the usage of.

government "accepted" the work performed by plaintiff. The howitzers produced by plaintiff were submitted for final inspection to the DCAS official, after which a government representative signed a DD250 acceptance form. Each DD250 form carries a DCAS official's signature beneath the following statement: "acceptance of listed items has been made by me or under my supervision and they conform to contract except as noted hereon or on supporting documents." Joint Exs. 172–173 (Acceptance DD250 forms & Shipping DD250 forms). The DD250 forms appear to certify defendant's acceptance of the howitzers at issue.

However, contract 5811's inspection clause incorporates the Federal Acquisition Regulation on Inspection of Supplies in fixed price contracts, 48 C.F.R. § 52.246-2(k) (1996), stating that government "[a]cceptance shall be conclusive, except for latent defects, fraud, gross mistakes amounting to fraud, or as otherwise provided in the contract." *Id.* Defendant argues that plaintiff committed fraud and gross mistakes amounting to fraud, and that latent defects existed, thus warranting revocation of acceptance. Plaintiff responds that none of these conditions existed and, consequently, the government's acceptance is final and irrevocable.

## A. Fraud

■ Defendant argues that it is entitled to revoke acceptance of the howitzers due to fraud committed by plaintiff. Revocation of acceptance due to fraud is permissible if defendant shows: (1) a misrepresentation of a material fact; (2) an intent to deceive; and (3) reliance on the misrepresentation by the government to its detriment. *Bar Ray Prods., Inc. v. United States,* 167 Ct.Cl. 839, 340 F.2d 343, 351 n. 14 (1964). The courts have not expressed the standard of proof that defendant must meet when revoking acceptance pursuant to a contract's inspection clause due to fraud by the contractor.

■ In civil actions, the presumed burden of proof is a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 286, 111

S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). However, this standard may be heightened where "particularly important individual interests or rights are at stake.'" *Id.* (citing *Herman & MacLean v. Huddleston,* 459 U.S. 375, 389, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983)). Relying on *SGW, Inc. v. United States,* 20 Cl.Ct. 174, 178 n. 2 (1990), plaintiff argues that fraud generally requires proof by clear and convincing evidence. The court disagrees.[3] Although the courts have stated that defendant must prove fraud by clear and convincing evidence under the Special Plea in Fraud provisions, it is not clear if this applies to general claims of fraud.

A helpful analogy can be drawn from the articulation of the rationale for imposing a clear and convincing evidence standard on the government for proof of fraud under the forfeiture statutes, which was set forth in *New York Mkt. Gardeners' Ass'n v. United States,* 43 Ct.Cl. 114, 1907 WL 832 (1908). The court stated:

> Parenthetically we may say here that, could the court sustain the charge [of fraud], the results would be far more consequential than those indicated by the assertion of limited counterclaims. The Revised Statutes provide that any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance of any part of any claim against the Government shall *ipso facto* forfeit the same. It would be the duty of the court to declare forfeited the entire contract if the proof certainly established the charge made. Harsh as the statutes are which impose such severe penalties for fraud in making up a claim, it is yet a necessary statute for the protection of the Government, and when such a charge is established this court will not only hesitate to enforce such penalties but will go to whatever extreme under the law which can be justified by the facts proven.
>
> . . . .

---

**3.** Notably, the Supreme Court in *Grogan* found that "Congress has chosen the preponderance standard when it has created substantive causes

of action for fraud." *Grogan,* 498 U.S. at 288, 111 S.Ct. at 660.

... [T]he burden of proof rests upon defendants to make good the charge, and the circumstances ought to be so clear and convincing that the mind can rest with safety upon the result.

*Id.* at 136–38. Thus, in setting the clear and convincing standard for establishing fraud in the context of the forfeiture statute, the court considered the severity of imposing claim forfeiture as well as plaintiff's interests which were at stake. The court's "hesitat[ion]" to impose claim forfeiture, and its desire to "rest with safety upon the result" resulted in the imposition of the heightened standard of proof. *Id.; see also Pewee Coal Co. v. United States,* 142 Ct.Cl. 796, 806, 161 F.Supp. 952 (1958) (referring to the forfeiture statute as "harsh"), *cert. denied,* 359 U.S. 912, 79 S.Ct. 588, 3 L.Ed.2d 574 (1959).

■ By contrast, finding fraud in this context will operate merely to revoke acceptance, a result significantly less severe than forfeiture of plaintiff's claim. Revocation is not so severe as to justify a heightened standard of proof. Therefore, the court finds a heightened standard of proof inappropriate; in the context of the inspection clause exceptions, the government need only prove fraud by a preponderance of the evidence.

The court now turns to its analysis of whether defendant has met its burden of proving plaintiff committed fraud.

**1. Misrepresentation of a Material Fact**

■ The first element of a claim for fraud is proof of a misrepresentation of material fact. Neither party disputes that the lack of contract-required TMB inspections is a material fact. The parties dispute only whether there has been a misrepresentation of this fact. Defendant argues that plaintiff misrepresented a material fact when it submitted DD250 forms, identifying the delivery of M109A2 howitzers which plaintiff knew did not comply with contract requirements.

The DD250 forms require the contractor to disclose all nonconformances to contract specifications. Plaintiff submitted two DD250 forms for each howitzer tendered under contract 5811. The first DD250 ("constructive delivery DD250") form is prepared by plaintiff, but signed by a DCAS representa-tive; this certifies defendant's acceptance. Plaintiff submits a second and final DD250 ("shipping DD250") form upon shipment to defendant. Each constructive delivery DD250 form states: "CONDITIONAL AC-CEPTANCE ONLY (REF. PAGE 3)." Page 3 of each DD250 form states that: CONDITIONAL GOVERNMENT AC-CEPTANCE IS SUBJECT TO CON-TRACTOR CORRECTION OF THE FOLLOWING AT NO COST TO THE GOVERNMENT .... [and] IDENTIFI-CATION, TO THE MAXIMUM EXTENT POSSIBLE, OF ANY DEFICIENCIES OR AREAS OF NON–CONFORM-ANCES WITH DRAWINGS/ SPECIFI-CATIONS/ PURCHASE DESCRIPTION. Joint Ex. 172 (Acceptance DD250 forms). Given plaintiff's requirement to identify areas of nonconformance under the conditional acceptance provision, plaintiff's failure to disclose the lack of 100% RT and MT inspection for the ASC TMBs constitutes a misrepresentation.

Plaintiff does not dispute that the DD250 forms did not disclose plaintiff's failure to inspect. Rather, plaintiff attempts to rebut defendant's charge of misrepresentation by arguing that the government knew how plaintiff performed its RT, MT and dimensional inspections and never objected. Plaintiff argues that defendant was aware because plaintiff gave a copy of the Korff letter and the June/July 1986 Trip Report to DCAS Branch Chief Landis. At trial, the parties presented conflicting evidence on the issue of whether plaintiff gave defendant copies of these documents. Through testimony by Albert Luckenbaugh, BMY Quality Assurance Engineer, BMY asserts that Luckenbaugh "hand-delivered" these documents to Leonard Landis, Branch Chief of the DCAS office, shortly after the June/July 1986 visits to ASC, and that he and Landis discussed the issues raised by these documents. Landis purportedly was not concerned about the failure to inspect.

Notably, Landis is the only government employee that BMY now claims it informed of ASC's failure to perform the contractually required MT and RT inspections. Mr. Landis was diagnosed with cancer in early 1987.

He underwent surgery in March 1987, and was at work for a few intermittent days until early summer 1987 when he was out on sick leave until his death in August 1987. Additionally, defendant challenged Luckenbaugh's credibility on cross-examination, highlighting his inability to recall critical facts about the alleged conversation.

Luckenbaugh's credibility was further challenged through the testimony of Federal Bureau of Investigation Special Agents Frank Beskid and Larry Van Loon. These agents testified that during an interview of Luckenbaugh on October 25, 1989, he did not mention the conversation with Landis. Further, although the agents and Luckenbaugh specifically discussed the Korff letter and the June/July 1986 Trip Report, as well as the issue of whether the government had notice of these documents, at no time during the course of the interview did Luckenbaugh mention that he had given copies to Landis. Furthermore, the agents testified that Luckenbaugh admitted that although DCAS was aware of the TMB cracking problem, it was not aware that the TMBs were not being 100% RT and MT inspected as required by contract. The court agrees with defendant's assertion that this constitutes an admission pursuant to the Federal Rules of Evidence. Fed.R.Evid. 801(d)(2)(D).

In response, plaintiff contends that the agents were uninformed and posed unclear questions during the interview, and now have incorrect recollections because of the passage of approximately seven years since the interviews. The court disagrees. Although the agents arguably did not recollect the precise words used during their interviews with Luckenbaugh, Beskid and Van Loon were able to recollect the substance of their interviews: namely, Luckenbaugh said that the government was not aware of the periodic inspections.

In addition, defendant introduced evidence of Landis's routine and practice in order to establish that Landis was not told about the failure to 100% RT and MT inspect the TMBs. Two DCAS program managers who worked with Landis on a daily basis, Ruth Markley and David Wiker, testified that neither had seen the June/July 1986 Trip Report or Korff letter. Markley stated that Landis's general practice would have been to take notice of the lack of RT and MT inspection because it constituted a deviation from the contract's requirements. As well, Markley stated that because DCAS was aware of BMY's previous TMB cracking problems, it would have taken special note of any failures to comply with TMB inspection requirements. She further testified that Landis would not have continued to accept the vehicles without inspected TMBs, and would have required BMY to submit a RFW. Wiker's testimony likewise reflected Landis's probable reaction to the Trip Report and Korff letter. In rebuttal, plaintiff presented evidence that Markley and Wiker would not necessarily be informed of every action taken on contract 5811. However, plaintiff did not address defendant's assertion that had Landis known of the noncompliance, he would have stopped acceptance of the howitzers and required plaintiff to submit a request for waiver.

Plaintiff submits that defendant admitted that a copy of the Trip Report had been given by Luckenbaugh to Landis. *See* Pl.'s Uncontested Facts 172. Relying on *Miner v. United States,* 14 Cl.Ct. 770 (1988), plaintiff argues that defendant has the burden of coming forward and presenting "substantial evidence to the contrary" of the uncontested fact, and that defendant has failed to do so. *Id.* at 775. The court holds that substantial evidence, as presented by defendant, exists to the contrary of the uncontested fact. Thus the stipulation is not binding on defendant.

Given the totality of the circumstances, the court finds the evidence given by defendant to be credible and convincing. Overall, there is no documentation, from either plaintiff or defendant, of the delivery of the Korff letter and Trip Report to Landis. The court finds that if Landis had been given the Korff letter and Trip Report, he would have stopped acceptance of the howitzers and would have asked plaintiff to submit a RFW. The court finds the testimony of Agents Beskid and Van Loon persuasive. Thus, the court finds as a matter of fact that defendant proved by a preponderance of the evidence that it did

not possess knowledge of the failure to conduct 100% RT and MT inspection through plaintiff's delivery of the Korff letter and Trip Report to DCAS chief Landis.

Plaintiff puts forth a second argument to show defendant possessed knowledge of how plaintiff performed RT and MT inspections. BMY claims that because defendant worked closely with plaintiff and its subcontractor, ASC, it knew of on-going problems with the TMBs through the casting problems addressed by both parties under contract 2035 and contract 5811. The court disagrees with plaintiff. The fact that defendant worked closely with plaintiff does not automatically connote government knowledge. The government cannot be expected to know of every deviation from contract specification. It could not have known from a reasonable inspection of the DD250 forms and the howitzers that 100% RT and MT and dimensional inspections had not been performed. Under the contract, plaintiff possessed the burden of disclosing the noncompliance. It is true that defendant knew of problems with the TMB rail areas and altered the RT inspection requirements accordingly. However, the inspections at issue here deal with the TMB journal bearing areas. Defendant could not have detected the failure to conduct these inspections absent notification by plaintiff of the noncompliance.

Overall, based on a careful review of the evidence presented, the court finds as a matter of law that plaintiff misrepresented compliance with the contract-required inspection system. Despite plaintiff's knowledge that ASC was not performing 100% RT and MT inspections, plaintiff failed to inform defendant of the nonconformance with the contract requirements. Plaintiff's misrepresentations are made even more egregious by the fact that plaintiff had many opportunities to disclose the failures and did not do so. The court further finds that defendant proved it did not possess knowledge of the nonconformances either through the alleged hand delivery of the Korff letter and June/July 1986 Trip Report, or through defendant's working relationship with ASC and plaintiff. Knowledge of plaintiff's failure to 100% RT and MT inspect according to contract specifications

did not occur until 1988. Thus, defendant has proven by a preponderance of the evidence that plaintiff misrepresented a material fact, the first step in proving a claim for fraud.

### 2. Intent to Deceive

Defendant argues that plaintiff manifested an intent to deceive, the second element in a claim for fraud. Defendant relies on three arguments to make this point. First, the government points to BMY's awareness that the ASC TMBs were not being inspected according to contract requirements, and its failure to remedy this noncompliance. Defendant also argues that plaintiff's failure to submit a request for waiver from the 100% RT/MT contract requirements manifests an intent to deceive. Finally, defendant asserts that although BMY knew 100% RT and MT inspections were not occurring, plaintiff represented that inspection results from ASC were not available due to ASC's bankruptcy proceedings, and that ASC's conformance to contract was manifested by the COCs. Each of these arguments is addressed below.

First, defendant contends that plaintiff knew of the failure to inspect, but deliberately did not enforce the 100% RT/MT inspection requirement at ASC. Specifically, defendant asserts that plaintiff "back[ed] off of ASC even though [plaintiff] had gathered enough information from [the] audit to shut ASC down." Def's Reply Br. at 9. For support, defendant cites Federal Bureau of Investigation Special Agent Gary Seifert's trial testimony on his interview with Luckenbaugh. Luckenbaugh told Seifert in interviews that "if he had shut them down, that is shut Adirondack down, then BMY would have been shut down." Trial Tr. at 2166:12–14 (Seifert Test.). Luckenbaugh further stated that "John Kunce [BMY's Director of Purchasing] was the person who asked him to back off and not shut them [ASC] down; to hound them, but not to bust them." *Id.* at 2166:21–23 (Seifert Test.). Defendant also points to Luckenbaugh's failure to "recall" the following allegations as corroboration of the Seifert testimony: (1) that his superiors told him to back off ASC or that he was ordered not to shut them down; (2) that when he advised his superiors of the quality

audit, they told him that if he shut ASC down he would shut BMY down; and (3) that the reason he never followed up on the June/July 1986 Trip Report is because his superiors told him to back off. Defendant asserts that Luckenbaugh's failure to deny the charges outright is evidence of their truth.

As corroborating evidence that plaintiff backed off ASC, defendant represents that "Luckenbaugh admitted at trial that he did nothing after his June/July 1986 visit to ASC to verify or ensure that ASC resumed 100% RT and MT inspections even though he returned to ASC on numerous occasions following his June/July 1986 visit." Def.'s Reply Br. at 10. To wit, Luckenbaugh conceded on cross-examination that despite the imposition of BMY source inspection at ASC in July 1986, he did not remember doing source inspection during his nine trips to ASC after July 1986. He did recall that Jim Bortner, BMY Quality Assurance Representative, may have performed source inspection, but he did not have direct personal knowledge of any source inspections.

Finally, defendant offers the testimony of former Director of Quality Assurance, Robert Bowersox, who testified that plaintiff intentionally designed a quality assurance audit system that celebrated beating the system, avoided purchasing inspection equipment because more inspections would reveal more problems, and was generally weak. Defendant avers that this testimony is consistent with Luckenbaugh's admission to Seifert that he was told to back off of ASC.

Plaintiff counters defendant's assertion that Luckenbaugh was told to "back off" of ASC by noting that Seifert also stated that Luckenbaugh said he was asked by plaintiff not to compromise on quality. Trial Tr. at 2225:2–3 (Seifert Test.). Notably, however, Seifert later altered his stance by stating that Luckenbaugh only said "he was not asked [by BMY] to compromise on quality." Trial Tr. at 2225:18 (Seifert Test.).

After weighing the evidence as to whether plaintiff deliberately backed off ASC and

failed to ensure that the required inspections were performed, the court finds that defendant has not met its burden. Agent Seifert's testimony is weakened significantly by his faulty recollection of events. However, Luckenbaugh's failure to "recall" the events posed by defendant does not convince the court that those events occurred. Luckenbaugh's admission that he did not personally conduct source inspection is countered by his understanding that another of plaintiff's employees performed the inspections.[4] Finally, Bowersox's general testimony as to plaintiff's quality assurance audit system does not bear specifically on the issue of whether plaintiff failed to ensure compliance with the contract in the present case.

■ However, defendant also contends that plaintiff's intent to deceive is manifested by its failure to submit a request for waiver or deviation on the RT and MT inspection noncompliance. Defendant asserts that plaintiff submitted DD250 forms after BMY's April 1986 trip to ASC, despite its knowledge of noncompliance. Plaintiff contends that it did not possess knowledge of the noncompliance until the June/July Trip Report. Based on the evidence, the court finds that BMY knew of the lack of 100% RT inspection as of April 1986. At trial, Luckenbaugh testified that during the April 1986 visit, the ASC radiographer responded with surprise when told of the 100% RT inspection requirement. Trial Tr. at 1792:1–10 (Luckenbaugh Test.). Luckenbaugh also testified that during the same visit, the ASC radiographer could not produce the SQAP RT inspection results. ASC's surprise as to the 100% RT requirement, and its failure to produce inspection results upon request, was a clear indication to BMY that ASC was not performing 100% RT inspection.

Moreover, defendant asserts that plaintiff failed to correct the noncompliance after becoming aware of it. Defendant urges the court to draw an adverse inference from Luckenbaugh's failure to testify about his visits in September, October and December

---

4. However, it is noteworthy that neither Jim Bortner nor Betty Carlson, the two other BMY employees who visited ASC after July 1986, made statements in their trip reports on the lack of contract-required TMB inspections.

1986. *Selle v. Gibb*, 567 F.Supp. 1173, 1182 (N.D.Ill.1983), *aff'd*, 741 F.2d 896 (7th Cir. 1984). Defendant cites *Barnett v. United States*, 6 Cl.Ct. 631 (1984), for the proposition that an adverse inference may be drawn "where a party fails to call a witness available to him who has knowledge of material facts." Id. at 671. Defendant asserts that Luckenbaugh's failure to testify as to the September, October and December 1986 visits gives rise to the inference that plaintiff did not encourage ASC to perform the contract-required inspections. In response, plaintiff argues that the post-July 1986 conduct is immaterial, given that it had already delivered the Korff letter and Trip Report to defendant. Because the court found that defendant did not possess knowledge of the failure to RT and MT inspect until 1988, plaintiff's post-July 1986 conduct is material to the determination of whether plaintiff acted with an intent to deceive as it continued to invoice defendant for howitzers containing uninspected TMBs.[5]

The court finds it clear that: (1) plaintiff did not submit a request for waiver for the lack of 100% RT and MT inspection; and (2) plaintiff did not perform 100% RT and MT inspection after April 1986, the period that plaintiff knew of the noncompliance. Although Luckenbaugh testified that he believed Bortner may have performed source inspection at ASC, Luckenbaugh clearly did not have direct personal knowledge of this fact. Plaintiff has presented no other evidence for its belief that ASC was performing 100% RT and MT inspections after July 1986. In light of all the evidence presented, the court finds as a matter of fact that plaintiff did not believe the inspections were being conducted by ASC.

■ As another indicia of intent to deceive, defendant next points to plaintiff's assertions that the RT and MT inspection results were unavailable because of ASC's bankruptcy, and that the ASC COCs proved performance of the inspection requirements.

Defendant charges that these representations manifest an intent to deceive because plaintiff made these statements despite its knowledge of the lack of inspection.[6]

In a meeting between the parties on November 4, 1988, plaintiff distributed a memorandum entitled "TMB Casting Quality Issues." In the memo, plaintiff stated that it is "unable to provide RT or MT inspection reports for any of the trunnion castings, supplied by Adirondack, showing conformance to the required 100% inspection.... All of the above documentation is held by Adirondack. Note: Adirondack is no longer in business." Joint Ex. 103 (Trunnion Casting Quality Issues Outline with handwritten notations, two versions, from November 1988). At the meeting, plaintiff never stated that the inspections were not being performed. Rather, plaintiff represented that it could not produce proof of 100% RT and MT inspection because the documents were inaccessible due to ASC's bankruptcy proceedings. At a November 22, 1988 meeting, plaintiff again responded to defendant's request for inspection results by stating that ASC was out of business. By November 1988, however, plaintiff clearly knew that ASC did not perform the contract required inspections and therefore ASC could not have produced the 100% RT and MT inspection results. At the same meeting, plaintiff also expressly represented that it possessed ASC's COCs, which certified compliance with all contract specifications. Despite plaintiff's knowledge that the RT and MT inspections were not being completed according to specifications, plaintiff offered the "COCs for weld repaired castings" as proof of compliance with contract requirements. Joint Ex. 542 (BMY document presented at November 22, 1988 meeting).

Plaintiff notes, however, that Jeff Rankin, plaintiff's former M109A2 Program Manager, testified he told Jan Kolwey, one of defendant's lead representatives, during a break at

---

5. It is also material, for purposes of defendant's False Claims Act counterclaims, in determining whether plaintiff acted with reckless disregard or deliberate ignorance.

6. Although plaintiff submitted a request for waiver on September 13, 1988, it addressed only plaintiff's failure to perform *dimensional* inspections on the TMB. The 1988 request for waiver did not address plaintiff's failure to conduct 100% RT and MT inspections.

a meeting on October 6, 1988, that it appeared the required inspections had not been performed. Furthermore, Kolwey's weekly update described the meetings between the parties held to discuss the dimensional inspection RFW. Kolwey writes that "[t]he additional nonconformances discovered include the failure of BMY to perform magnetic particle and radiographic inspection on the trunnion mounting bracket castings as required by drawing and QAP." Joint Ex. 530 (U.S. Army engineer Jan Kolwey's update dated Oct. 12, 1988, regarding Oct. 6, 1988 meeting with BMY). Defendant notes that there is no documentation for Rankin's conversation with Kolwey at the October 6, 1988 meeting. Moreover, defendant asserts that the break conversation is inconsistent with the silence of the other BMY employees present at the meeting. Finally, defendant argues that after the October 6, 1988 meeting, defendant would not have asked plaintiff for the RT and MT results had it known plaintiff was not performing the contract-required frequency of inspection.

■ Even given the conflicting evidence on exactly when plaintiff disclosed the failure to 100% RT and MT inspect the TMBs pursuant to contract, plaintiff did not explicitly disclose the noncompliance to defendant until October 1988, at the earliest, over two years from plaintiff's initial discovery of the deviation from contract in April 1986. Overall, plaintiff argues that defendant has no direct evidence of an intent to deceive, but rather cites a mere series of failures. The court disagrees. It is true that fraud connotes "deliberate misstatement or improper action with an intent to deceive." *Appeal of Catalytic Eng'g & Mfg. Corp.*, 72–1 BCA (CCH) ¶ 9342, at 43,365, 1972 WL 20918 (A.S.B.C.A. Feb. 28, 1972), *aff'd on reh'g*, 72–2 BCA (CCH) ¶ 9518, 1972 WL 3008 (A.S.B.C.A. May 30, 1972). However, the Court of Claims has stated that:

> it is not necessary in order to establish fraud that it is incumbent upon the party making the allegation to prove it by direct and positive evidence. Indeed, in a matter of this kind circumstantial evidence would likely afford the only proof that could be adduced, and circumstantial evidence is

frequently of more force than direct testimony. Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, be sufficient to constitute conclusive proof.

*New York Mkt. Gardeners' Ass'n*, 43 Ct.Cl. at 137–38. Thus, plaintiff's claim that it lacked intent to deceive because it believed ASC began conforming to the RT/MT requirements falls short. Defendant has proven by a preponderance of the evidence that plaintiff did not take steps to remedy the noncompliance after July 1986. Therefore, plaintiff had no reason to believe that ASC complied with the 100% RT/MT inspection requirement. Despite clear requirements that plaintiff disclose any deviations from contract requirements, plaintiff failed to disclose and did not submit a request for waiver during that time. Although it is true that there is no "direct" evidence of plaintiff's intent to deceive, defendant has presented sufficient circumstantial evidence to meet its burden. The court finds that plaintiff possessed an intent to deceive defendant.

### 3. Defendant's Reliance on the Misrepresentation to its Detriment

■ Finally, defendant must prove reliance on the misrepresentation to its detriment in order to make a claim for fraud. *Bar Ray Prods.*, 340 F.2d at 351 n. 14. Defendant argues that it relied on plaintiff's representations of inspection compliance on the DD250 forms to its detriment. Defendant contends that had it been aware of plaintiff's failure to perform the contract-required inspections, it would not have accepted the howitzers or authorized payment to plaintiff. Instead, it would have required plaintiff to submit a request for waiver or a request for deviation from contract. The court agrees. Plaintiff's failure to RT and MT inspect according to contract was sufficiently serious that defendant would have stopped acceptance of the howitzers. As a result of plaintiff's failure to disclose the nonconformances, defendant was forced to deadline the howitzers. The failure to inspect posed safety concerns for the TMBs' structural soundness which, because the cannon is mounted on the TMB, could lead the

howitzers to explode if the TMBs were not constructed properly.

Thus, after carefully reviewing the evidence presented at trial and in pleadings, the court finds that defendant has proven by a preponderance of the evidence that plaintiff has committed fraud. As a result, defendant's acceptance is not deemed final and plaintiff is not entitled to an equitable adjustment.

### B. Gross Mistakes Amounting to Fraud

 In arguing that its acceptance was not final, defendant asserts that in addition to fraud, plaintiff also committed gross mistakes amounting to fraud, and produced howitzers with latent defects. Because the court finds acceptance revocable due to fraud, the court need not address the existence of gross mistakes amounting to fraud and latent defects.

 However, it is worthy to note that defendant also presented sufficient evidence for the court to find gross mistakes amounting to fraud. To establish a gross mistake amounting to fraud, defendant must show that plaintiff committed:

> a mistake so serious or uncalled for as not to be reasonably expected, or justifiable, in the case of a responsible contractor for the items concerned.... [A] gross mistake would be understood to amount to fraud when the misleading statement or action is made by mistake and without an intent to deceive but induces the acceptance of supplies not conforming to contract requirements to the buyer's detriment.

*Catalytic Eng'g*, 72–1 BCA (CCH) at 43,365. Thus, the crucial difference between fraud and gross mistakes amounting to fraud is the necessity of intent to deceive. Defendant need only show plaintiff's misrepresentation of a material fact and reliance on the misrepresentation to defendant's detriment. However, the contractor's "mistake" must be one " 'which a responsible contractor acting honestly would not reasonably be supposed to make.' " *Stewart Avionics*, 75–1 BCA (CCH) at 53,631 (quoting *Catalytic Eng'g*, 72–1 BCA (CCH) at 43,369).

In proving that plaintiff committed fraud, defendant has proven—under any evidentiary standard of proof—that plaintiff misrepresented material facts and that defendant relied on those misrepresentations to its detriment. Defendant also proved by a preponderance of the evidence that plaintiff acted with an intent to deceive. Given the court's finding as to intent to deceive, plaintiff certainly made mistakes that a responsible contractor, acting honestly, could not reasonably be supposed to make. Thus, the court finds that defendant has presented sufficient evidence to prove gross mistakes amounting to fraud.

### II. Defendant's Counterclaims

As stated above, defendant successfully asserted the affirmative defense of fraud in response to plaintiff's claim for equitable adjustment. Defendant also raises three separate counterclaims. Based on the evidence at trial, defendant asserts: (1) plaintiff's liability under the False Claims Act, 31 U.S.C. § 3729 (1994); (2) that plaintiff breached its contract when it tendered howitzers that did not conform to contract; and (3) that plaintiff forfeited its claim against defendant because it practiced fraud during contract performance.

### A. The False Claims Act

There are two aspects to defendant's False Claims Act counterclaim: (1) that plaintiff submitted false claims in violation of the Act; and (2) that plaintiff submitted false records to support its false claims in violation of the Act. Each aspect will be discussed separately below.

#### 1. False Claims

Under the first part of defendant's False Claims Act counterclaim, "[a]ny person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent *claim* for payment or approval ... is liable" to the Government for treble damages and civil penalties. 31 U.S.C. § 3729(a)(1) (emphasis added). In order to prevail on its § 3729(a)(1) counterclaim, defendant must show that:

(1) the contractor presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; (3) the contractor knew the claim was false or fraudulent; and (4) the United States suffered damages as a result of the false or fraudulent claim.

*Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1043 (Fed.Cir.1994) (citing *Miller v. United States,* 213 Ct.Cl. 59, 550 F.2d 17 (1977)).

### a. Claims for Payment

■ Defendant asserts that each DD250 form submitted by plaintiff for howitzers containing ASC TMBs was a claim for payment under the False Claims Act. Defendant argues that the DD250 forms, once signed, were used as invoices. Citing *United States v. Bornstein,* 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), defendant avers that plaintiff's submission of each DD250 form constitutes a separate False Claims Act violation. Plaintiff concedes that the signed DD250 forms were used to secure payment for the howitzers accepted by defendant. Thus, the first element of the False Claims Act analysis is satisfied.

### b. False or Fraudulent Claims

■ Defendant argues that each constructive delivery DD250 form was false or fraudulent because each represented that all contract requirements had been met, even though BMY knew this not to be the case. Thus, plaintiff sought payment for howitzers when the TMBs had not been inspected as required. As stated above, plaintiff was required to identify "deficiencies or areas of nonconformances" upon submission of each DD250 form to defendant. Joint Ex. 172 (Acceptance DD250 forms). In light of this requirement, the court found that plaintiff misrepresented material facts to defendant. *See supra* Section I.A.1.

Citing *United States ex rel. Butler v. Hughes Helicopters, Inc.,* 71 F.3d 321 (9th Cir.1995), and *United States v. Cannon,* 41 F.3d 1462 (11th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 86, 133 L.Ed.2d 44 (1995), plaintiff contends that in the absence of falsi-

ty on its face, a DD250 form cannot constitute a false claim under the False Claims Act. Further, plaintiff relies on *Butler* and *Cannon* to assert that mere preparation and submission of DD250 forms does not constitute an implied representation that a product fully complies with the underlying contract. The court finds plaintiff's reliance on *Butler* and *Cannon* misplaced.

Both *Butler* and *Cannon* are distinguishable from the present facts. The *Butler* court held that "where the DD–250s were *not* used as invoices, and the qui tam plaintiff introduced into evidence no false supporting documents, the DD–250s were not 'claims' under the FCA." *Butler,* 71 F.3d at 330 (emphasis added). As stated above, the DD–250 forms in the present case were used as invoices by the parties. Thus, *Butler* is clearly distinguishable from the present case. In *Cannon,* the United States prosecuted the plaintiff pursuant to 18 U.S.C. § 1001, a criminal statute, for using false documents to defraud the government. *United States v. Cannon,* 41 F.3d at 1464. Under § 1001, the government must prove that the defendant "knowingly and wilfully falsified, concealed or covered up by trick, scheme, or device a material fact, or made false, fictitious or fraudulent statements or representations, or made or used any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry." *Id.* at 1468 (citing 18 U.S.C. § 1001). Under 18 U.S.C. § 1001, the government must prove the defendant "guilty beyond a reasonable doubt of using false documents or representations to defraud the government." *Id.* at 1469 (citing *United States v. Kelly,* 888 F.2d 732, 740 (11th Cir.1989)). By contrast, defendant need prove plaintiff's false claims under 31 U.S.C. § 3729 by only a preponderance of the evidence. Thus, *Cannon* is distinguishable from this case because implied representation may be sufficient for a finding of fraud under a preponderance standard. The court finds the *Cannon* explicit representation requirement simply not applicable. Defendant concedes that plaintiff did not explicitly certify that the information on the DD250 forms was accurate, but contends that it is not necessary for invoices to contain

expressly false statements. *United States ex rel. Fallon v. Accudyne Corp.*, 921 F.Supp. 611, 627 (W.D.Wis.1995).

This court has held that, for the purposes of the False Claims Act, an implied representation on an invoice that work has been completed pursuant to the contract requirements may constitute a false claim for payment. *Ab–Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 433–34 (1994), *aff'd*, 57 F.3d 1084 (Fed.Cir.1995); *Daff v. United States*, 31 Fed. Cl. 682, 695 (1994), *aff'd*, 78 F.3d 1566 (Fed.Cir.1996). In order for defendant to show that an implied representation constituted a violation of the False Claims Act, defendant must prove by a preponderance of the evidence that plaintiff deliberately withheld information. *Daff v. United States*, 31 Fed. Cl. at 688–89; *Sterling Millwrights v. United States*, 26 Cl.Ct. 49, 95 (1992).

Although plaintiff admits that implied false representation on a claim for payment may constitute a violation of the False Claims Act, plaintiff asserts that courts have only recognized this in a few recent cases which are distinguishable from this case. *Ab–Tech Constr. v. United States*, 31 Fed. Cl. 429, 433–34 (1994); *Daff v. United States*, 31 Fed. Cl. 682, 688–89 (1994). Plaintiff argues that the *Ab–Tech* and *Daff* holdings are not applicable because the fraud present in those cases was more egregious than exists in the present case. The *Ab–Tech* plaintiff's conduct was marked by deliberate withholding and active concealment of information from the government. Furthermore, the president of *Ab–Tech Construction, Inc.* was convicted under 18 U.S.C. § 1001 for making false statements to the government. Although the *Ab–Tech* court cited extreme circumstances in finding a § 3729(a)(1) violation, ultimately the court stated that the withholding of "information critical to the decision to pay—is the essence of a false claim." 31 Fed. Cl. at 434. *Ab–Tech* stands for the proposition that implied representation of information critical to the decision to pay, can form the basis of a False Claims Act cause of action, regardless of the type of implied representation. As the *Fallon* court states:

If a contractor knowingly fails to perform testing as required by a contract, and tenders the untested goods, making a claim for full payment, it has surely submitted a false claim. Under such circumstances a false claim may arise from not advising of a failure to perform a material part of the contract. This circumstance was aptly described by the court in *Ab–Tech*.

921 F.Supp. at 621. Accordingly, in the present case, plaintiff withheld from defendant information on plaintiff's noncompliance with the inspection specifications. This information was critical to defendant's decision to pay; thus, the present case is in accord with *Ab–Tech*. Furthermore, plaintiff tendered howitzers containing ASC TMBs with the knowledge that ASC had failed to perform 100% RT, MT and dimensional inspections, and made claims for full payment. Thus, plaintiff's actions give rise to a false claim cause of action.

Similarly, in *Daff*, the court found "clear and convincing evidence of fraud", which plaintiff claims cannot be found in this case. However, the *Daff* court never states that to prove a False Claims Act violation, clear and convincing evidence of fraud is necessary. Rather, the *Daff* court expressly notes the presence of an intent to deceive, even though "[n]o specific intent to defraud is necessary" to prove a False Claims Act violation. *Daff*, 31 Fed. Cl. at 688–89. Thus, a preponderance of the evidence standard is fully consistent with Daft.

Although plaintiff did not make expressly false representations on the DD250 forms, plaintiff's implied representations fall into the category of acts that constitute false or fraudulent claims. As stated, in order for defendant to show that an implied representation constituted a violation of the False Claims Act, defendant must prove that plaintiff deliberately withheld information by a preponderance of the evidence. *Daff*, 31 Fed. Cl. at 688–89; *Sterling Millwrights*, 26 Cl.Ct. at 95. Defendant has proven that BMY acted with an intent to deceive when it submitted DD250 forms to the government with the knowledge that 100% RT and MT inspections were not being performed on the TMBs. Plaintiff had many opportunities to

disclose the failure to inspect, but failed to do so. *See supra* Section I.A.2. Thus, this court concludes that plaintiff deliberately withheld information from the government in its delivery of DD250 forms which constituted the submission of false and fraudulent claims. This satisfies the second element of the False Claims Act analysis.

### c. Contractor Knowledge of Falsehood or Fraudulence

 Plaintiff knew that its claims were false or fraudulent, therefore satisfying the third element of the False Claims Act claim. The False Claims Act defines a person who acts "knowingly" as one who: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. Specific intent to defraud is not required. 31 U.S.C. § 3729(b). In the present case, plaintiff knew as of April 1986 that ASC was not performing 100% RT inspections. Despite this knowledge, plaintiff failed to inform defendant of the noncompliance. Thus, plaintiff acted "knowingly" because it had actual knowledge that the representations on the DD–250s were false or misleading. *See supra* Section I.A.2.

### d. Damages Suffered by Defendant Because of False Claims

 To prove the final element of a False Claims Act claim, defendant asserts that it would not have signed the DD250 forms and authorized payment had it been aware that the TMBs were not inspected. In addition, defendant suffered by having to deadline the howitzers containing ASC TMBs until the TMBs could be field tested. *See supra* Section I.A.3. These damages include amounts for the interest due to the government on contract payments made prematurely.

### 2. False Record or Statement

 Under the False Claims Act, 31 U.S.C. § 3729(a)(2) (1994), "[a]ny person who knowingly makes, uses, or causes to be made or used, a false *record or statement* to get a false or fraudulent claim paid or approved by the government . . . is liable" to the Government for treble damages and civil penalties.

*Id.* (emphasis added). The government must prove that: (1) plaintiff made, used or caused to be made or used, a record or statement to get a claim against the United States paid or approved; (2) the record or statement and the claim were false or fraudulent; (3) plaintiff knew that the record or statement and the claim were false or fraudulent; and (4) the United States suffered damages as a result. *Chemray Coatings Corp. v. United States,* 29 Fed. Cl. 278, 284 (1993) (citing *United States ex rel. Stinson v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1259 (S.D.Fla.1989)).

 Defendant argues that plaintiff used ASC COCs and plaintiff's own form 45–9s as records to get claims against defendant paid. As evidence, defendant states that during late 1988, plaintiff proffered the ASC COCs as proof that ASC had performed inspections, and that DCAS periodically reviewed plaintiff's files. However, plaintiff argues that it never submitted the ASC COCs and the 45–9s to any of defendant's representatives, and that none of defendant's representatives ever reviewed the COCs and 45–9s. Plaintiff further asserts that the contract did not require plaintiff to submit any inspection results, certifications, or acknowledgments to defendant for any vehicle or part thereof. Plaintiff relies on *Godley v. United States,* 26 Cl.Ct. 1075 (1992), *vacated and remanded on other grounds,* 5 F.3d 1473 (Fed.Cir.1993), for the proposition that absent an actual submission of a false record or statement, the False Claims Act is inapplicable.

 *Godley,* however, is distinguishable from the present case. The contractor in *Godley* "never gave any representation" to the government, and thus the government "could not have relied" on the alleged fraudulent record; thus there could be no False Claims Act violation. 26 Cl.Ct. at 1087. In the present case, when defendant asked plaintiff for inspection records to prove that 100% RT and MT inspections were being performed by ASC, plaintiff represented that the inspection results were not available. In the alternative, plaintiff proffered the ASC COCs as proof that the inspections were being performed, despite knowledge that

ASC did not conduct 100% RT and MT inspection. Although plaintiff did not actually give copies of the ASC COCs to defendant, the court finds that actual delivery of false records is not necessary for a False Claims Act violation for false records to attach. It is sufficient that plaintiff explicitly stated that the COCs existed as supporting documents for a proposition that plaintiff knew to be false.[7] Thus, the first element is satisfied.

To prove the second element, defendant asserts that the COCs and 45–9s were false because they state that the howitzers met all contract specifications, even though the TMBs had not been inspected as required. Plaintiff does not dispute that the records were false or fraudulent. Furthermore, as stated above, plaintiff knew that its claims and its records were false, thus satisfying the third element. This is proven by plaintiff's possession of actual knowledge that the TMB inspections were not being performed pursuant to contract specifications while allowing the ASC COCs and the 45–9s to reflect compliance with the contract.

Finally, relying on the false records and false claims, defendant suffered damages through being forced to deadline the howitzers until field inspections could be performed. *See supra* Sections I.A.3., II.A.1.d.

Defendant has shown all elements of a False Claims Act claim; thus, the court finds plaintiff violated the False Claims Act by using false records to get false claims paid by defendant.

## B. Breach of Contract

 Defendant also asserts breach of contract as a counterclaim. To establish this, defendant must prove the existence of a contract, performance by the government, breach by the contractor, and injury to the government. *Cleland v. Stadt,* 670 F.Supp. 814, 817 (N.D.Ill.1987). Plaintiff argues that the counterclaim cannot be maintained because acceptance is final pursuant to contract

5811's inspection clause. *See Appeal of Genuine Motor Parts of Pennsylvania, Inc.,* 76–1 BCA (CCH) ¶ 11,860, at 56,817, 1976 WL 1989 (A.S.B.C.A. April 15, 1976). As stated above, however, defendant's acceptance was not final because of the presence of fraud and gross mistakes amounting to fraud. As defendant's acceptance is not final, defendant's breach of contract counterclaim is tenable.

The parties do not contest the existence of the contract. Defendant asserts that it has performed by paying plaintiff for the howitzers delivered by plaintiff under contract 5811. Furthermore, defendant avers that plaintiff's failure to ensure the inspection of all ASC TMBs as required clearly violates the requirements of the contract and thus constitutes a breach. The court agrees and finds that defendant has successfully proven the existence of the contract, performance by defendant and breach by plaintiff.

 Defendant claims it has suffered injury because seventy-six of the ASC TMBs had "unacceptable defects." The court finds defendant's argument misplaced. Defendant failed to prove that the ASC TMBs actually possessed defects that caused injury. Although defendant proved that field RT inspections uncovered defects in the ASC TMBs, defendant did not put forth evidence that the defects caused defendant injury. Rather, the court finds that defendant's injuries from plaintiff's breach stem from defendant's deadlining of the howitzers containing ASC TMBs in April 1989. After discovering plaintiff's failure to adhere to the contract-required TMB inspection procedures, defendant could not permit the howitzers to be used in the field due to fear for the safety of those using them. Consequently, use of the howitzers was delayed to allow for field testing. It was this delay that caused defendant to suffer injury.

Thus, the court finds that defendant has met its burden of proving plaintiff breached the contract.

---

7. As discussed in Section I.A.2., plaintiff alleged that on October 6, 1988, about one month prior to plaintiff's proffer of the COCs as proof of contract compliance, Rankin mentioned to Kolwey that the 100% RT/MT inspections were not performed. Even if the October 6 conversation occurred, plaintiff subsequently presented the COCs as evidence of contract conformance in lieu of actual inspection results. Plaintiff knew the 100% RT/MT inspection results could not and did not exist, but continued its attempt to mislead defendant into believing that 100% RT/MT inspection occurred. Thus, plaintiff used the COCs as false records to support its false claims.

**128**

### C. Special Plea in Fraud (28 U.S.C. § 2514)

▮ Finally, defendant asserts a special plea in fraud as a counterclaim. "A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof" 28 U.S.C. § 2514 (1994). In order to prevail on its special plea, the government must prove the elements of common law fraud by clear and convincing evidence. The four elements of common law fraud are: (1) misrepresentation of a material fact; (2) intent to deceive or a reckless state of mind; (3) justifiable reliance on the misrepresentation by the deceived party; and (4) injury to the party deceived through reliance. *Colorado State Bank v. United States*, 18 Cl.Ct. 611, 629 (1989), *aff'd*, 904 F.2d 45 (Fed.Cir. 1990).

As stated above, in response to plaintiff's claim for equitable adjustment, defendant successfully proved fraud to revoke its acceptance of the howitzers pursuant to the inspection clause. However, defendant's special plea in fraud counterclaim differs from its assertion of fraud as a defense to plaintiff's claim for equitable adjustment. When asserting fraud as a defense pursuant to the inspection clause, defendant need only prove fraud by a preponderance of the evidence. By contrast, defendant must prove fraud by clear and convincing evidence to succeed on its special plea. *See supra* Section I.A.

▮ Although defendant proved intent to deceive by a preponderance of the evidence for the purpose of revoking acceptance, the court finds that defendant has not presented clear and convincing evidence of intent to deceive. Defendant presented no direct evidence of intent to deceive, and much of its supporting circumstantial evidence is countered by conflicting evidence presented by plaintiff. *See supra* Section I.A.2. Thus, while defendant's evidence suffices to prove intent to deceive by a preponderance of the evidence, the totality of the circumstances cannot prove the same by clear and convincing evidence. As a result, defendant cannot succeed on its forfeiture statute counterclaim.

### CONCLUSION

The court denies plaintiff's claim for an equitable adjustment on the grounds that defendant's acceptance is revocable due to fraud and gross mistakes amounting to fraud. Defendant's counterclaims under the False Claims Act and for breach of contract are allowed. Defendant's special plea in fraud is denied.

Within forty-five days, defendant shall file a brief identifying and supporting damages and costs to be awarded in accordance with this opinion. Plaintiff may respond within thirty days.

**IT IS SO ORDERED.**